No. 61,074

STATE OF KANSAS, *Appellee*, v. RONALD E. BROWN, *Appellant*.

(783 P.2d 1278)

Opinion filed December 8, 1989.

*Steven R. Zinn*, supervising attorney, Kansas Appellate Practice Clinic, of Lawrence, argued the cause, and *Michelle Worrall*, legal intern, Kansas Appellate Practice Clinic, and *Benjamin C. Wood*, former chief appellate defender, of Topeka, were with him on the brief for appellant.

*E. Leigh Hood*, county attorney, argued the cause, and *Daniel L. Love*, former county attorney, and *Robert T. Stephan*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: After a bench trial, Ronald Brown was convicted of one count each of possession of cocaine (K.S.A. 65-4127a) and possession of marijuana (K.S.A. 65-4127b [a] [3]). On appeal, he claims: (1) The district court erroneously considered evidence which was obtained illegally by the police; (2) the small amount of cocaine residue found in his possession cannot constitute a violation of K.S.A. 65-4127a; and (3) there was insufficient evidence to establish his intent to possess cocaine. After determining that Brown had consented to the search, the Court of Appeals affirmed his convictions. We accepted Brown's petition for review.

On November 4, 1986, Officers Holeman and Brigman of the Dodge City Police Department went to the home of Ricky L. Fender in order to arrest Fender for writing a worthless check. The check, which had been made out to the defendant for $200, had been cashed by Brown at a local grocery store. Before approaching the residence, Lieutenant Chambers placed a phone call to verify that Fender was at home. A man, who turned out to be Brown, answered the phone and put Fender on the line. Following this verification, Officer Holeman moved to the front door of the residence while Officer Brigman secured the back door.

Brown answered the door and told Officer Holeman that Fender was in Wichita. Officer Holeman told Brown that he knew Fender was at home and entered the residence to execute the arrest warrant for Fender. The officer found Fender in the basement, attempting to flush what appeared to be drug paraphernalia down a toilet. Officer Holeman placed Fender under arrest, searched him, and found a syringe in one of his pockets. At this point, Captain Rogers and Lieutenant Chambers were summoned to the residence. The officers conferred and determined they should seek a search warrant for the premises and for all individuals found inside.

When Brown asked to leave the premises, Captain Rogers responded: "[W]e are getting a search warrant; I can't allow anything to leave but if you want to leave, I am going to have to search you." Brown consented to a search of his person and the police found a syringe with cocaine residue and a bag of marijuana in his pockets. Because Brown had consented to the search, he was not included in the search warrant application. A warrant was subsequently issued for a search of the premises and of Fender. Other facts will be provided as necessary to resolve the issues.

The Fourth Amendment to the United States Constitution protects the person and the person's home from unreasonable police intrusion. The seizure of an individual occurs when an officer, by means of physical force or show of authority, has in some way restrained the liberty of the person. *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Generally, a search of a detained person which is conducted without the benefit of a

search warrant is illegal. However, there are exceptions to this general rule. One of the exceptions to the requirement for a search warrant is a search made with consent or waiver voluntarily, intelligently, and knowingly given by the individual seized. When the individual later claims that consent was not voluntarily and intelligently given, the State must prove consent to the search was proper by a preponderance of the evidence. *State v. Pearson*, 234 Kan. 906, 920, 678 P.2d 605 (1984). A warrantless search is not justified when the consent is given under the official pretense of having a search warrant, when in fact there was no warrant.

Brown claims that his consent, given after being seized by the officers, was invalid since (1) it was obtained by coercion and (2) the police lacked the probable cause needed to obtain a warrant. At the suppression hearing, Captain Rogers described the events which preceded the search:

"Q [by defense counsel] When you got to the house, was it your order that Brown be detained there until a search warrant could be obtained?
"A [by Rogers] I didn't order anybody. One of my statements was—
"Q What was your statement? Go through that, if you would, please.
"A Okay. After I was briefed, I advised everybody, okay, don't attempt any search; we'll obtain a search warrant based upon—
"Q And that search warrant was going to be for what?
"A For the house and the people in it.
"Q And the people in it?
"A Yes, the total premises.
"Q Okay. Fine. Then what?
"A Okay. I asked them if Mr. Brown was living there. He said he had been staying there. So at that point, I told him, okay, *we are getting a search warrant; I can't allow anything to leave but if you want to leave, I am going to have to search you, okay?* And he said okay. And that is when he got up and went over against the wall." (Emphasis added.)

At trial, Rogers testified: "I informed Mr. Brown that we were going for a search warrant . . . ."
Brown described the incident in this way:

"Q [by defense counsel] . . . At that point, did anyone ask you if they could search your person, your body?
"A [by Brown] Well, they told me—they told me that— they asked me if I lived there; I said no, I just stayed there when I came over from Garden City; and he said, well, you can leave but we are going to have to search you before you go; and if you don't, we are going to hold you until we get a search warrant and search you anyway.

"Q All right. Did you tell them then, well, go ahead and search; or what did you say?

"A Well, I felt like I didn't have any choice, you know; they was going to search me anyway. They may as well go ahead and get it over with."

Brown states that his case is analogous to *State v. Stitzel*, 2 Kan. App. 2d 86, 575 P.2d 571 (1978), where a police officer, after stopping a car for a traffic violation, smelled alcohol on the driver's breath. The driver consented to the officer's request to search the car for beer. During the search, the officer observed Stitzel, a passenger, sitting bent over with his legs close together as though he was trying to cover up something. The officer asked him to get out of the car. After finishing his search of the car, the officer noticed that Stitzel was holding his arms tightly against his body. The officer asked Stitzel what he had under his coat and Stitzel replied, "Nothing." The officer then asked Stitzel to take his arms away from his body. When he did, two bags of marijuana fell out.

In reversing Stitzel's conviction for possession of marijuana, the Court of Appeals found that the defendant had not voluntarily consented to the search. If the defendant had not raised his arms, the officer would have searched him anyway. The situation was inherently coercive, beginning with the request to get out of the car so the officer could continue his search of it. Defendant was faced with what was really an order, although couched in terms of a request. The defendant must have realized that the officer was not really looking for beer cans or bottles under his arms but had commenced a general exploratory search; he merely bowed to the inevitable. Under those circumstances, the Court of Appeals did not believe that mere compliance with the officer's request could have led to a reasonable inference of voluntary consent.

*Stitzel* is distinguishable from the present case insofar as Brown was given an option—be searched now and then be allowed to leave, or wait for a warrant.

In 2 LaFave, Search and Seizure § 8.2 (c) (1978), Professor LaFave differentiates between a threat to *obtain* a warrant versus a threat to *seek* a warrant. To illustrate this distinction, he quotes from the concurring opinion in *United States v. Faruolo*, 506 F.2d 490, 497 (2d Cir. 1974):

" 'First, the agent should be permitted to do no more than give his prediction. Even if he need not explain the discretionary aspect of issuing warrants, he surely should not be permitted to convey the idea that no discretion exists. Any intimation that the warrant will automatically be issued should be considered as coercive as the announcement of an invalid warrant in [*Bumper v. North Carolina*, 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968)]. Drawing the line at this point admittedly makes validity of consent turn in some instances on subtle shifts of wording by the agent. But words spoken in the process of obtaining consent to waiver of a constitutional right ought to be chosen with care. The officers are not proceeding in haste to make a split-second decision of their authority to apprehend a fleeing suspect. They face a situation that normally calls for the delay necessary to obtain a search warrant. If they are to forego this requirement, it should not be too much to ask that they take care not to confront the accused with a choice that totally obliterates the important protective function of the warrant-issuing process. The agent can always be on the safe side of the line by plainly indicating that he will apply for a warrant and believes one will be issued, but that the decision whether to issue the warrant rests with the judge or magistrate to whom the agent will apply.' " p. 646.

Professor LaFave concludes:

"[I]t may generally be said that a threat to *obtain* [versus a threat to *seek*] a search warrant is likely to be held to invalidate a subsequent consent if there were not then grounds upon which a warrant could issue, and likely not to affect the validity of the consent if the police then had probable cause upon which a warrant could issue. As to the latter situation, it has been expressly held that if 'in fact there were grounds for the issuance of a search warrant,' then 'the well founded advice of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion.' This proposition rests upon the conclusion that the 'threat' in such circumstances does not involve any deceit or trickery, but instead accurately informs the individual of his precise legal situation. But this means that under the better view the police act at their peril in threatening to obtain a search warrant; it is not enough that their threat was made in the good faith expectation that a warrant would issue, there must *in fact* be probable cause." pp. 648-49.

Brown argues that the police did not have probable cause to believe that he was involved in illegal drug activity. He points to the following: (1) The police were in the process of executing an arrest warrant for Ricky L. Fender when they entered Fender's residence; (2) the warrant was based on a worthless check written by Fender, not on illegal drug activity; (3) a police officer testified that Brown was cooperative and did not appear to be under the

influence of drugs; (4) Brown indicated that he was only a visitor at the Fender residence; and (5) no drugs were found in the bedroom where Brown and his family had been staying.

Brown argues that his mere presence in the house did not provide the probable cause needed for the issuance of a warrant to search him. In support of this argument, he cites *Ybarra v. Illinois*, 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979), and *State v. Lambert*, 238 Kan. 444, 710 P.2d 693 (1985). In *Ybarra*, an Illinois state court had issued a warrant to search a tavern and the bartender for evidence of narcotics. Upon entering the tavern to execute the warrant, officers announced their purpose and advised those present that they were going to conduct a cursory search for weapons. One of the officers felt what he described as a "cigarette pack with objects in it" in his first pat-down of Ybarra, a patron of the bar. He patted down other customers before returning to Ybarra, at which point he retrieved a cigarette pack filled with heroin.

Ybarra was indicted for unlawful possession of a controlled substance. He filed a pretrial motion to suppress the contraband seized from him at the tavern. The trial court denied the motion, holding that the search was sanctioned by an Illinois statute similar in wording to K.S.A. 22-2509. On appeal, the United States Supreme Court held that the searches of Ybarra and the seizure of the drugs in his pocket violated the Fourth Amendment. The Supreme Court reasoned that probable cause to search Ybarra was absent both at the time of the issuance of the warrant and upon entering the tavern.

In *Lambert*, a warrant had been issued which authorized the search of an apartment and its known occupant, Randy, for cocaine. Upon executing the warrant, the police found two women sitting at a kitchen table. Between the two women was a serving tray which contained marijuana. After placing the women under arrest for possession of marijuana and moving them into the living room, a detective returned to the kitchen and searched a purse which was also on the kitchen table. The purse contained marijuana and another drug. After determining that the purse belonged to Lambert, the detective informed her that she was also under arrest for possession of methamphetamine.

The trial court eventually suppressed the evidence found in Lambert's purse and acquitted her. In answering a question reserved by the State, we held:

"A person's mere nearness to others independently suspected of criminal activity does not, without more evidence, give rise to probable cause to search that person. Since the officer executing the search warrant had no reason to believe that the purse lying on the kitchen table next to the defendant belonged to Randy, the officer could not reasonably believe that the purse was part of the premises described in the search warrant.

"Under proper circumstances the police may search a nonresident visitor or his belongings in the course of executing a warrant for a premises search. These circumstances include: where the individual consents to being searched, where the item is in plain view on the person or in his possession, where there has been a valid arrest and where there is probable cause to search plus exigent circumstances. A search may also be conducted under the *Terry* exception, which allows a stop and frisk where there is a reasonable belief that the person is armed and dangerous." 238 Kan. at 450.

The lesson from both *Ybarra* and *Lambert* is that the police may not expand the scope of a search warrant without first obtaining judicial approval. Unlike *Ybarra* and *Lambert*, the police in this case were in the process of obtaining a search warrant when Brown consented to the search. The question that remains is whether probable cause existed to search Brown for evidence of illegal drug activity when he gave his consent.

The State argues that the following circumstances would have supported a finding of probable cause for a magistrate to issue a search warrant: (1) On the day before the arrests, the police had received information through the Crimestoppers program that drugs were being sold from the Fender residence and that Fender was financing drug buys with worthless checks; (2) the worthless check for which Fender's arrest had been ordered was made out to and cashed by Brown; (3) when Brown answered the door at the Fender residence, he told officers that Fender was not at home, knowing this to be false; (4) while attempting to arrest Fender, officers observed him attempting to flush drug paraphernalia down a toilet; (5) after arresting Fender, the officers searched him and found a syringe in one of his pockets; and (6) other items of drug paraphernalia were scattered about in the area where Fender was arrested and Brown was being held.

The United States Supreme Court has crafted several theories under which the evidence seized from Brown may have been admitted into evidence. Two of these are the independent source rule and the inevitable discovery rule.

In *Murray v. United States*, 487 U.S. 533, 101 L. Ed. 2d 472, 108 S. Ct. 2529 (1988), federal agents, who were observing suspected narcotics traffickers, saw some of the suspects driving vehicles into and out of a warehouse. After those vehicles were lawfully seized and found to contain marijuana, the agents returned to and entered into the warehouse, where they found bales wrapped in burlap. The bales were later found to contain marijuana. The agents left the warehouse under surveillance and applied for a warrant to search the warehouse, without mentioning their prior entry or what they had observed. After obtaining a warrant, the agents reentered the warehouse and seized the bales of marijuana. The defendants moved to suppress the evidence, claiming: (1) The search warrant was invalid because the agents had failed to inform the issuing magistrate of their warrantless entry; and (2) the warrant was tainted by that entry. The United States District Court rejected the argument and denied the motion to suppress. The Court of Appeals affirmed, assuming for the purposes of its decision that the initial entry had been unlawful. On *certiorari*, the United States Supreme Court held: (1) The "independent source" doctrine—under which evidence seized in violation of the Fourth Amendment is admissible if that evidence has a source independent of the illegality—applies not only to evidence seized for the first time during an independent lawful search, but also to evidence that is initially discovered during or as a consequence of an unlawful search, if the seizure was ultimately untainted by the initial illegality; (2) the evidence in question may thus be admissible if the second search was, in fact, a genuinely independent source of that evidence, which would not be the case if the agents' decision to seek the warrant was prompted by what they saw during the initial entry or if information obtained during that entry was presented to the magistrate issuing the warrant and affected the magistrate's decision; and (3) since the district court had not made a clear determination on this point, the case was remanded for such a determination.

The United States Supreme Court has also crafted the inevitable discovery rule, which applies in this case. In *Nix v. Williams*, 467 U.S. 431, 81 L. Ed. 2d 377, 104 S. Ct. 2501 (1984), following the disappearance of a young girl, Williams was arrested and arraigned. He then obtained an attorney. The police informed his attorney they would transport Williams without questioning him. During the trip, one of the officers began a conversation with Williams that resulted in Williams making an incriminating statement and directing the officers to the girl's body. Prior to Williams' statement, 200 volunteers were searching in the area where the body was located. The search was called off when Williams led officers to the body. Williams moved to suppress the evidence of the body and all related evidence, claiming that the evidence was the fruit of his illegally obtained statement. The Iowa Supreme Court upheld the trial court's refusal to suppress the evidence. The case was brought into federal courts through habeas corpus proceedings. The United States Supreme Court ultimately held that the police had obtained Williams' statement in violation of his Sixth Amendment right to counsel. However, even though the statement could not be admitted in his second trial, evidence of the body's location and condition might be admitted since the body would have inevitably been discovered without the incriminating statement. The Court held that, if the prosecution could establish by a preponderance of the evidence that the unlawfully obtained evidence ultimately or inevitably would have been discovered by lawful means, the evidence would be admissible.

In the present case, officers were preparing to obtain a search warrant for the premises and all individuals found in the premises. They had probable cause to obtain a warrant to search Brown. The officers who were to obtain the warrant for Brown were told that it was no longer needed since he had consented to the search. Here, if Brown had not consented, the evidence would have inevitably been discovered when the search warrant was obtained.

Generally, a threat to obtain rather than a threat to seek a search warrant will invalidate a subsequent consent if there were not then grounds upon which a warrant could issue. If a law enforcement officer states that a search warrant can be obtained and, in fact, there are grounds for the issuance of a warrant, the

statement is correct and does not constitute coercion. However, law enforcement officers act at their peril in threatening to obtain a search warrant unless probable cause actually exists.

Probable cause, which a magistrate must find before issuing a search warrant, refers to that quantum of evidence which would lead a prudent person to believe that an offense has been committed. It is not necessary that the evidence giving rise to such probable cause be sufficient to prove guilt beyond a reasonable doubt, nor must it be sufficient to prove that guilt is more probable than not. It is only necessary that the evidence lead the magistrate to believe that guilt is more than a possibility, and it is well established that the belief may be predicated in part upon hearsay information. *State v. Lamb*, 209 Kan. 453, Syl ¶ 3, 497 P.2d 275 (1972), *rev'd on other grounds* 225 Kan. 38, 43, 587 P.2d 861 (1978). The evidence here was sufficient for a magistrate to believe that Brown's involvement in illegal drug activity was more than a possibility—that probable cause existed to search the house and its occupants for evidence of illegal drug activity. Therefore, Brown's consent to the search was valid.

### The Amount of Cocaine Seized

Brown argues that the minuscule amount of cocaine residue found in the syringe was insufficient to establish his intent to possess that drug. K.S.A. 65-4127a provides:

"Except as authorized by the uniform controlled substances act, it shall be unlawful for any person to . . . possess [or] have under his control . . . any opiates, opium or narcotic drugs."

K.S.A. 65-4101(p)(4) includes cocaine in the definition of a narcotic drug. A KBI forensic examiner testified that the cocaine in the syringe appeared as a small amount of moisture to the naked eye.

A minority of jurisdictions accept Brown's argument: "[E]vidence that microscopic chemical analysis of narcotics paraphernalia discloses traces of a narcotic, in the absence of any additional proof as to usability of traces as a narcotic, is insufficient to show the violation of the narcotics or dangerous drugs laws." 28 C.J.S., Drugs & Narcotics Supplement § 203.

Kansas appellate courts, however, have adopted the majority view: "[T]he proof of the possession of *any* amount of a controlled

substance is sufficient to sustain a conviction even though such amount may not be measurable or useable." (Emphasis added.) *State v. Berry*, 223 Kan. 102, Syl. ¶ 2, 573 P.2d 584 (1977). See *State v. Loveland*, 8 Kan. App. 2d 196, 199, 653 P.2d 472 (1982), *rev. denied* 232 Kan. 876 (1983); *State v. Sabater*, 3 Kan. App. 2d 692, 693, 601 P.2d 11, *rev. denied* 227 Kan. 928 (1979), *cert. denied* 446 U.S. 918 (1980). We adhere to the majority rule and decline Brown's invitation to overrule our prior cases.

### The Sufficiency of the Evidence

Even if the amount of cocaine seized was sufficient to constitute a criminal violation, Brown argues that there was still insufficient evidence to prove that he intended to possess that drug. At trial, Brown testified that, as he went to answer the door, he saw the syringe lying on the floor, picked it up, and put it in his pocket. The State presented evidence that Brown had recently purchased cocaine and had used it on the day of his arrest. As the trier of fact, the court obviously did not accept Brown's explanation.

In a criminal action, when the defendant challenges the sufficiency of the evidence to support a conviction, the standard of review on appeal is whether all of the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of a charge are sustained. *State v. Dunn*, 243 Kan. 414, 429, 758 P.2d 718 (1988). There was sufficient evidence to establish that Brown intended to possess the cocaine found in his pocket.

The judgments of the trial court and the Court of Appeals are affirmed.

Six, J., not participating.