No. 62,067

STATE OF KANSAS, *Appellee*, v. DENNIS D. McKESSOR, *Appellant*.

(785 P.2d 1332)

Opinion filed January 19, 1990.

*Thomas Jacquinot,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Tom Bath,* assistant district attorney, argued the cause, and *Robin A. Lewis,* assistant district attorney, *Paul J. Morrison,* district attorney, and *Robert T. Stephan,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Dennis McKessor was convicted by a jury of two counts of aggravated robbery (K.S.A. 21-3427) and three counts of kidnapping (K.S.A. 21-3420). On appeal, McKessor claims the following errors: (1) the handgun found in his motel room should have been suppressed; (2) a victim's pretrial and in-court identifications of him should have been suppressed; (3) his kidnapping convictions were multiplicitous with his convictions for aggravated robbery; (4) the jury instruction on kidnapping was inadequate; (5) he should have been allowed to make a closing argument since he was allowed to represent himself at trial as co-counsel; and (6) certain remarks made during closing argument were so prejudicial as to warrant a new trial.

FACTS:

This case stems from two armed robberies which occurred in Johnson County on August 7, 1986. At approximately 3:00 p.m., a man entered the Leawood Cleaners, produced a chrome-plated handgun, and demanded money from Mary Headley, the clerk. While Ms. Headley was gathering money from the cash register, Lulu Karlson entered the building to drop off some cleaning. Once Ms. Karlson was inside, the armed robber ordered her to move behind the counter. After taking the money, the robber moved both women to the back of the building, forced them to lie face down on the floor, and told them to remain there because he would be back. When they were sure the robber had left, the women called the police.

In addition to giving the police a statement, Ms. Karlson helped to create a composite drawing of the robber. She was not satisfied with this drawing. Ms. Karlson also informed the police that she had observed a late model, red Ford Mustang parked in front of the cleaners. She stated that a man in this car appeared to be watching traffic and had watched her as she entered the cleaners. Ms. Karlson felt that he was also involved in the robbery.

Later that night, at approximately 8:30 p.m., a man entered Singleton's Liquor Store in Overland Park, produced a chrome-plated handgun, and demanded money from Jose Mendoza, the store clerk. After the robber removed money from the cash register, he moved Mr. Mendoza into a lavatory at the rear of the

store and told him to remain there for 15 minutes or his partner would blow his head off. After the robber had departed, Mr. Mendoza waited a few minutes, then returned to the front of the store and called the police. On August 8, from a photo lineup, Mr. Mendoza identified McKessor as the man who had robbed the liquor store.

At 11:20 p.m. on August 10, a Lenexa police officer informed detectives that a Ford Mustang which matched the description given by Ms. Karlson was in a motel parking lot. After Detective Smith arrived at the motel and determined that the license plate which was on the Mustang was stolen, he showed a photograph of McKessor to the desk clerk. The clerk indicated that the man in the photograph had registered as Dennis Davis and was in room 345. Because McKessor was thought to be armed and the adjoining rooms were occupied, Smith was ordered to place the room under surveillance and wait for McKessor to leave. Other officers began the process of obtaining a search warrant for room 345.

At 8:03 the following morning, Detective Smith observed McKessor leave his room and smoke a cigarette on the public breezeway. Smith decided to immediately arrest McKessor and proceeded, with other officers, to the room. After McKessor had reentered the room but before he had completely closed the door, officers forced their way into the room. Smith ordered McKessor to his knees and asked him if anyone else was in the room and for the location of the gun. McKessor indicated that another man was in the bathroom and the gun was under the dresser. The gun was seized and McKessor and Robert Grist, the man in the bathroom, were arrested. McKessor was charged with the liquor store robbery.

Later on August 11, when Ms. Karlson was shown a photo lineup, she thought she recognized McKessor's and Grist's photographs and asked to see them in person. On August 20 at an in-person lineup, Ms. Karlson identified McKessor as the man who had robbed the cleaners and Grist as the man she had seen sitting in the Mustang. The defendant was later charged with the robbery of the cleaners. At trial, McKessor was positively identified by Ms. Headley, Ms. Karlson, and Mr. Mendoza.

## The Admissibility of the Gun

McKessor claims the trial court erred in denying his motion to suppress the pistol found in his motel room. He first argues that the weapon was seized as the result of an illegal, warrantless arrest. McKessor claims there was no exigency since: (1) his room had been under surveillance for several hours; (2) the evidence would not have been lost if the officers had obtained a search warrant prior to entering the room; and (3) the police had intentionally allowed him to return to the room before arresting him. The State argues that the warrantless arrest was proper on two grounds: (1) Detective Smith had probable cause to believe that a warrant had been issued for McKessor's arrest; and (2) exigent circumstances justified the arrest.

A law enforcement officer may arrest a person if the officer has probable cause to believe that a warrant for the person's arrest has been issued in this state or in another jurisdiction for a felony committed therein. K.S.A. 22-2401 (b). The seizure of an individual occurs when an officer, by means of physical force or show of authority, has in some way restrained the liberty of the person. *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Generally, a search of a detained person which is conducted without the benefit of a search warrant is illegal. However, there are exceptions to this general rule. *State v. Pearson,* 234 Kan. 906, 920, 678 P.2d 605 (1984). The Fourth Amendment to the United States Constitution protects the person and the person's home from unreasonable police intrusion. For Fourth Amendment purposes, a person's motel room is treated the same as his home. *United States v. Jeffers,* 342 U.S. 48, 51-52, 96 L. Ed. 59, 72 S. Ct. 93 (1951).

At the suppression hearing, officers testified that prior to arresting the defendant they had been informed by other officers that a warrant for McKessor's arrest had been issued in Overland Park. The detective who had obtained the warrant for the defendant's arrest did not testify at the suppression hearing. In denying McKessor's motion to suppress the gun, the trial court correctly noted there was no evidence to contradict the arresting officer's belief that a warrant for McKessor's arrest had been issued in this state.

The State claims the present case is also analogous to *United States v. Santana,* 427 U.S. 38, 49 L. Ed. 2d 300, 96 S. Ct. 2406 (1976). In *Santana,* an undercover narcotics officer arranged to buy heroin from McCafferty and waited while she obtained the drugs from "Mom Santana." McCafferty returned with the heroin and was arrested. Moments later, officers observed Santana standing in the doorway of her home, holding a bag which contained packets of heroin. As the officers approached the house and identified themselves, Santana retreated into her vestibule. The police followed her into the house and arrested her. Santana was subsequently convicted for possession of heroin with intent to distribute.

In affirming Santana's conviction, the Court first held that she had no reasonable expectation of privacy while standing in her doorway. Since the officers had probable cause to believe that she had committed a felony, there was no Fourth Amendment violation when they attempted to arrest her without a warrant. The Court further held that Santana's retreat into her house could not thwart an otherwise proper arrest:

"The fact that the pursuit here ended almost as soon as it began did not render it any the less a 'hot pursuit' sufficient to justify the warrantless entry into Santana's house. Once Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence." 427 U.S. at 43.

As the Tenth Circuit noted in *U.S. v. Aquino,* 836 F.2d 1268, 1271 (1988), *Santana* is the "only case in which the Supreme Court has held the exigent circumstances exception sufficient to justify warrantless entry into a suspect's home."

Though McKessor was not fleeing from the police when he reentered his motel room, the officers who arrested him knew that he was dangerous and armed, and that an accomplice might be in the room. In addition, the officers feared that if McKessor was able to reenter the motel room, the occupants of adjoining rooms would be in danger. The State's reliance on *Santana* and the exigent circumstances exception is not misplaced.

McKessor further argues that, even if his arrest was valid, the police ascertained the location of the gun by violating his right against self-incrimination. There is no question that the police asked McKessor for the location of the gun prior to reading him

the *Miranda* warning. The State argues that this conduct was constitutionally permissible because it met the public safety exception contained in *New York v. Quarles,* 467 U.S. 649, 81 L. Ed. 2d 550, 104 S. Ct. 2626 (1984).

In *Quarles,* a woman stopped a patrol car and told the officers that she had been raped by an armed man who had just run into a nearby grocery store. The officers entered the store, saw a man who fit the description given by the woman, and chased him into a back room. With four officers present, the defendant was searched and handcuffed. Without first reading him the *Miranda* warning, the officers asked for and the defendant revealed the location of his pistol. The defendant's pre-*Miranda* statement and the gun were excluded by the trial court, as were defendant's later statements which were found to be tainted by the *Miranda* violation. In reversing the trial court's exclusion of evidence, the Court said:

"We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers . . . in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them." 467 U.S. at 657-58.

The public safety exception outlined in *Quarles* is applicable to this case. The officers had reason to believe that McKessor was armed and they knew that some of the adjoining motel rooms were occupied. Because McKessor indicated that there was another man in the bathroom, the police acted in the interest of public safety by determining, without delay, the location of weapons in the room. See *State v. Roadenbaugh,* 234 Kan. 474, 480, 673 P.2d 1166 (1983).

The State also argues that the gun was admissible since it would have inevitably been discovered. The inevitable discovery doctrine was set out in *Nix v. Williams,* 467 U.S. 431, 444, 81 L. Ed. 2d 377, 104 S. Ct. 2501 (1984): "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful

means . . . the evidence should be received." Here, the arrest and questioning took place shortly after 8:03 a.m.; a search warrant for the room was issued at 10:15 a.m. If the gun had not been recovered prior to the issuance of the search warrant, it would have been properly and inevitably discovered during the execution of the warrant. See *State v. Brown,* 245 Kan. 604, 783 P.2d 1278 (1989) (inevitable discovery rule applied when defendant consented to a search while police were in process of obtaining a warrant).

### The Identifications by Ms. Karlson

McKessor claims the police violated his Sixth Amendment right to counsel when they allowed Ms. Karlson to view him in a lineup on August 20. McKessor had been charged with the crimes at the liquor store on August 11; he was not charged with the crimes at the cleaners until after Ms. Karlson identified him during the lineup.

In denying McKessor's motion to suppress the identifications, the trial court noted: "The Sixth Amendment guarantees attach only after the initiation of judicial criminal proceedings against an individual. At the time of the physical lineup in question, it is beyond dispute that Defendant was not under arrest on charges [relating to Ms. Karlson]."

McKessor claims that, because both robberies were tried together, his right to counsel for the robbery of the dry cleaners attached on August 11 when he was appointed counsel for the liquor store robbery. He argues that Ms. Karlson's pretrial and in-court identifications were improper since they reinforced Mr. Mendoza's identification during the trial.

McKessor relies on *Maine v. Moulton,* 474 U.S. 159, 180, 88 L. Ed. 2d 481, 106 S. Ct. 477 (1985), and *Arizona v. Roberson,* 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093 (1988, as authority. In *Moulton,* incriminating statements by the accused pertaining to pending charges were inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes. Under *Roberson,* if the State violates the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel, incriminating statements by the accused pertaining to the pending charges and crimes under investigation may be suppressed.

McKessor equates identification of the accused and statements obtained from a witness to crimes that have not yet been charged to statements obtained from the accused who has been appointed an attorney to represent him in a separate crime. Such reasoning is an unwarranted expansion of *Moulton's* and *Roberson's* prohibition of admitting into evidence statements of the accused to include identification of the accused by witnesses.

A suspect in a criminal case has no right to have counsel at a lineup conducted prior to the filing of formal criminal charges against him. This is not a critical stage of the proceeding which gives rise to a right to counsel. The Sixth Amendment guarantees attach only after the initiation of judicial criminal proceedings against an individual. *State v. Estes*, 216 Kan. 382, 385-86, 532 P.2d 1283 (1975) (citing *Kirby v. Illinois*, 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877 [1972]). At the time of both the photo lineup and the physical lineup, McKessor had not been charged with the robbery at the cleaners; therefore, his Sixth Amendment right to counsel was not violated.

In addition, during the trial, Ms. Karlson testified that her identification of the defendant as the person who had robbed the Leawood Cleaners with a gun was based only upon her observations at the time of the robbery. Pretrial identifications made in violation of the Sixth Amendment will not preclude in-court identifications if the prosecution can establish by clear and convincing evidence that the in-court identifications were based on observations of the suspect other than the lineup identification. *United States v. Wade*, 388 U.S. 218, 240, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967). Even if McKessor had had a right to counsel at the lineups as to all charges, Ms. Karlson's in-court identification of McKessor was still properly allowed.

### The Kidnapping Convictions

One of the methods of committing the act of kidnapping is the taking or confining of any person, accomplished by force, threat, or deception, with the intent to hold such person to facilitate flight or the commission of any crime. K.S.A. 21-3420(b).

During the Leawood Cleaners robbery, McKessor forced Ms. Headley and Ms. Karlson at gunpoint to the rear of the building and ordered them to remain there while he made his escape. He similarly forced Mr. Mendoza into a lavatory at the rear of

the liquor store and told him to remain there or his partner would blow Mendoza's head off. McKessor was convicted of kidnapping each of these individuals.

In *State v. Buggs,* 219 Kan. 203, 216, 547 P.2d 720 (1976), we discussed the taking and confinement required for K.S.A. 21-3420(b) kidnapping:

"[I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:

"(a) Must not be slight, inconsequential and merely incidental to the other crime;

"(b) Must not be of the kind inherent in the nature of the other crime; and

"(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection."

Here, moving the victims to the rear of the stores and threatening them substantially lessened McKessor's risk of detection and aided his escape.

McKessor concedes that all three confinements met the *Buggs* standard for kidnapping. In addition, he points out that all robberies committed with a gun confine the person being robbed. He claims, however, that this court's holding in *Buggs* violated the doctrine of strict construction. McKessor contends that *Buggs* should be overruled and that the legislature should decide how to resolve the multiplicity problem created under a strict construction of K.S.A. 21-3420(b).

It is well established that the interpretation of statutes is a function of the judiciary. *State, ex rel., v. Moore,* 154 Kan. 193, 197-98, 117 P.2d 598 (1941). The legislature, of course, could overrule our interpretation in *Buggs* at any time by amending K.S.A. 21-3420(b). Since the legislature has taken no action to overturn our interpretation of the statute in 13 years, it is clear that this court's definition of confinement in *Buggs* accurately reflects the intent of the legislature.

### The Kidnapping Instruction

McKessor requested the following jury instruction on kidnapping:

"The defendant is charged with the crime of kidnapping. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:
1. That the defendant took [the three people] by force;
2. That it was done with intent to hold such person[s] to facilitate flight;
3. *That 'facilitate' means more than just to make more convenient;*
4. *That 'to facilitate'. must have some significant bearing on making the commission of the crime easier;*
5. *That the taking:*
   *(a) must not be slight, inconsequential and merely incidental to the other crime;*
   *(b) must not be of the kind inherent in the nature of the other crime;*
   *(c) must have some significance independent of the aggravated robbery in that it substantially lessens the risk of detection; and*
6. That this act occurred on or about the 7th day of August, 1986, in Johnson County, Kansas."

The trial court rejected the proposed instruction and, instead, used PIK Crim. 2d 56.24, which does not include the italicized words, but otherwise is identical.

Essentially, McKessor argues that *Buggs* added an additional *element* to 21-3420(b) kidnapping and that, "[a]bsent a *Buggs*-type of instruction, the jury may literally convict for kidnapping at any time it convicts for robbery, rape or other crimes." Since his defense to the kidnapping charges was based on "non-substantial facilitation," McKessor argues that the court's instruction denied him the opportunity to present his theory of the case to the jury. The State points out that defense counsel referred to the *Buggs* test and argued "non-substantial facilitation" in his closing remarks.

In *State v. Nelson*, 223 Kan. 572, 573-74, 575 P.2d 547 (1978), this court approved the use of the pattern instruction under similar circumstances. The policy question for this court is whether our holding in *Nelson* should be overruled. This we decline to do.

## McKessor's Right to Self-Representation

At trial, McKessor sought to introduce evidence that Benny Garrett had confessed to the crimes for which he was charged. When his attorney refused to offer this evidence, the trial court allowed McKessor to act as his own counsel for the purpose of examining Garrett and one other witness, Neil Jones. At the instructions conference, McKessor's counsel requested that McKessor be allowed to make the following statement during closing argument:

"I would like to say to the jury that the testimony that Benny Ray Garrett gave should prove to the jury I did not do the robbery he is not charged with nor the kidnapping. Also the testimony that Neil Jones gave, ladies and gentlemen, should prove to the jury that I did not do the robberies I am charged with. And I would like to say that I did not rob or kidnap anyone on August 7, 1986 in Johnson County, Kansas."

The trial court denied this request.

McKessor concedes that the district court was under no obligation to allow him to act as co-counsel and to examine witnesses in his own defense. However, since the court allowed him to do so, McKessor argues that he acquired the "right to argue the merit of the evidence to the jury."

McKessor was represented by an attorney throughout this case. During closing argument, McKessor's counsel made the following statement:

"You must consider all of the evidence submitted, that includes the evidence and testimony of Benny Garrett, Neil Jones. You have a number of exhibits, confessions, statements to review. And you should consider all that evidence in making your decision.

"You have heard Mr. Garrett and Mr. Jones testify. You must keep an open mind until you walk into that jury room and discuss the case. Consider all of the evidence submitted to you."

This argument substantially incorporated the statement McKessor wanted to make.

While a party has the right to represent himself or be represented by counsel, he does not have the right to a hybrid representation. Further, the defendant who accepts counsel has no right to conduct his own trial or dictate the procedural course of his representation by counsel. *State v. Martin,* 241 Kan. 732, 737, 740 P.2d 577 (1987). The trial court did not err by refusing to allow both McKessor and his attorney to argue the case to the jury.

### The State's Closing Remarks

The following was said during closing argument:

. "[PROSECUTOR]: I find it very strange that [defense counsel] can argue that Mrs. Karlson wants so badly to pick out the person and to solve this crime. . . .

"I also find it pretty incredible—

"[DEFENSE COUNSEL]: Your Honor, I object. This is a personal opinion. I don't think that is proper closing argument, what she finds.

"THE COURT: Overruled.

. . . .

"[PROSECUTOR]: . . . Mrs. Karlson, who identified the defendant on a couple of occasions as well, you heard her testimony. When she thought she was going to die, she thought it was an awful way for her mother to lose one of her daughters.

"And Mr. Mendoza, who stated when he looked at that person face to face, with the old Mexican saying, mano-mano, man to man before you meet your maker.

"[DEFENSE COUNSEL]: Your Honor, I object. I think this is arguing—

"THE COURT: Overruled, counsel. Please don't interrupt the argument, counsel. That is perfectly legitimate argument, you know it is."

As for these remarks, McKessor complains: (1) the prosecutor's use of the phrase "I find" improperly interjected her personal opinion into the argument; (2) her use of the word "find" was improper since it is the function of the jury, not the prosecutor, to find the facts; (3) her reference to Mr. Mendoza's "maker" improperly interjected religion into the trial; (4) the prosecutor's remarks were unduly intended to arouse sympathy for the victims; and (5) the trial court's admonition in overruling defense counsel's last objection was improper. McKessor argues that these factors, when viewed together, violated his right to due process of law and warrant a new trial.

McKessor is correct in that "[a] prosecutor should not inject his personal opinion into the [closing] argument." *State v. Williams*, 228 Kan. 723, 732, 621 P.2d 423 (1980). In *State v. Chism*, 243 Kan. 484, 493, 759 P.2d 105 (1988), this court set out the applicable standard of review: "Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and deny him a fair trial." Here, the statements by the prosecutor and the court were not so gross and flagrant as to prejudice the jury against the defendant and deny him a fair trial. McKessor's rights were not substantially violated by the remarks made during closing argument.

The judgment of the trial court is affirmed.