NOT DESIGNATED FOR PUBLICATION

No. 117,025

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

KYLE MCCOOL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; JEFFRY J. LARSON, judge. Opinion filed January 5, 2018. Convictions reversed, sentences vacated, and remanded with directions.

*Chase L. Miller*, of Miller & Miller, Chtd., of Emporia, for appellant.

*Darrell L. Smith*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., LEBEN and POWELL, JJ.

POWELL, J.: Kyle McCool appeals his convictions for possession of drug paraphernalia and possession of tetrahydrocannabinol or possession of marijuana. McCool argues the district court erred in denying his motion to quash the search warrant by finding the search warrant valid and by finding McCool's consent to the search was not coerced. Because we agree with McCool that law enforcement coerced his consent to let them search his apartment, we reverse McCool's convictions, vacate his sentences, and remand the case with instructions for the district court to suppress the evidence obtained from the unlawful search.

1

In April 2016, the Emporia Police Department and the Lyon County Sheriff's Department conducted a joint investigation into a suspected drug dealer, Eric Maxwell. The investigators, Deputy Sheriff Heath Samuels and Police Detective Dominic Vortherms, had a confidential informant complete a controlled buy of marijuana from Maxwell at an Emporia gas station. On May 10, 2016, the confidential informant completed a second controlled buy of marijuana using $90 of imprest funds (money specially marked for later identification by authorities) in Maxwell's basement apartment at 121 West 15th.

After the second controlled buy, the investigators acquired a search warrant covering the entire premises of 121 West 15th, a house that had been converted into multiunit apartments. According to McCool's arrest affidavit, the search warrant specifically covered "illegal narcotics, and recorded 'Imprest Fund Money.'" Samuels and Vortherms executed the warrant that night. The search warrant and supporting affidavit are not included in the record on appeal.

McCool, who lived in one of the ground-level apartments, answered Samuels' knock. McCool left the front door to the house ajar, which is to the left of an outer storm door and does not contain a number. Samuels stated that he had a warrant to search the house and then pushed open the door and walked up three stairs to a kitchen area. Samuels cleared the ground-level portion of the home and gathered about five people into the kitchen. Samuels smelled burnt marijuana upon entry, so he read everyone their *Miranda* rights. A few people made statements to him disclosing that they had been smoking and had marijuana in their rooms. Meanwhile, Vortherms and other officers secured the downstairs portion of the home.

After clearing the upstairs, Samuels knew the house was divided into separate apartments. McCool and his roommates had repeatedly told Samuels that the house was divided into separate apartments. Also, when Samuels went downstairs to talk to Vortherms, he saw two doors labeled 2 and 3.

After returning upstairs, Samuels apologized to the individuals upstairs and told them that the search warrant only should have been issued for the downstairs apartment. He also informed them that because Maxwell was selling drugs out of his apartment, it looked like they also were going to get into "trouble." Samuels allowed some of the individuals in the home who were visitors to leave, but he informed the others that if he had to conduct a search that night, they would go to jail. Subsequently, McCool led Samuels to his bedroom where he gave Samuels marijuana and drug paraphernalia. Samuels testified at the suppression hearing that he premised the search of McCool's apartment on the search warrant and testified that if the individuals upstairs had not complied he would have obtained another warrant. Samuels did not take McCool to jail that night.

On May 20, 2016, the State charged McCool with one count of possession of drug paraphernalia and one count of possession of tetrahydrocannabinol or possession of marijuana. McCool filed a motion to quash the search warrant, alleging the investigating officers failed to sufficiently specify the place to be searched within a multiunit building.

At the hearing on McCool's motion, the district court heard testimony that in applying for the search warrant the investigating officers were aware that the house was divided into multiple apartments. Although the house looked like a single-family home, it was located near Emporia State University and in an area where students tend to reside. Vortherms testified that he remembered from prior dealings at the house that it was divided into apartments. Samuels—who prepared the warrant application and supporting

3

affidavit—also learned that it was divided into apartments by conducting a search on the local county appraiser's site.

The officers also testified that, in preparing the warrant application, they reviewed other public records but did not include them in the supporting affidavit. Vortherms testified that the officers found a prior police report filed by McCool reporting a stolen moped. In the report, McCool identified his address only as 121 West 15th. Samuels testified that he also searched water utility records, which showed that a single bill for the whole property was paid by someone other than McCool or Maxwell.

Samuels also testified that he used the confidential informant's description of the property from the controlled buy and his own observations to describe the property in the affidavit. Specifically, Samuels testified that he had waited in his car in a church parking lot behind Maxwell's apartment during the second controlled buy and watched the confidential informant step over a retaining wall and enter Maxwell's apartment through a bay window that opened outwards. Samuels only saw the back of the property but did not notice any other door on the back of the house. The confidential informant told Samuels that Maxwell lived in a bottom-floor, two-bedroom apartment with one roommate. The confidential informant entered and exited through the bay window and never went through the front of the residence or further into the home. The confidential informant did not notice a specific apartment number on Maxwell's apartment but had noticed a door on the north wall.

Vortherms testified that he went to 121 West 15th following the second controlled buy on May 10, 2016, and before the execution of the search warrant. Vortherms testified that the front door contained a sign with an arrow pointing to the east side of the home that read "Use Other Door." Vortherms knocked on the east storm door and talked to McCool, telling him that there had been a burglary in the area and he wanted to know if everyone was okay and whether McCool had roommates. McCool told Vortherms that he

4

had several housemates and pointed to the downstairs and upstairs areas of the home. McCool did not open the door wide, but Vortherms could see a stairway to the downstairs and a few stairs leading up to a living room area. Vortherms also noted that the residence did not contain multiple mailboxes identifying separate occupants, merely a single mailbox.

At the end of the hearing, the district court found the search warrant and the supporting affidavit valid. The court stated that the investigating officers undertook an adequate investigation to determine if the house was divided into multiple apartments but expressed uncertainty about whether Samuels took proper action by continuing to interact with McCool in the upstairs apartment after learning that 121 West 15th was a multidwelling structure. Based on the State's argument that Samuels' interaction with McCool was a voluntary encounter, the district court continued the hearing for one week and requested that each party submit caselaw on the issue of whether McCool was coerced into consenting to the subsequent search of his apartment.

At the second hearing on McCool's motion, the district court made additional factual findings that Samuels smelled marijuana and read everyone their *Miranda* rights, and several individuals admitted to smoking marijuana and having marijuana in their bedrooms. The district court also found that Samuels told McCool that if he cooperated he would not go to jail, but if he had to get a search warrant McCool likely would go to jail. Relying on *State v. Brown*, 245 Kan. 604, 783 P.2d 1278 (1989), the district court denied McCool's motion to suppress because it found that Samuels had probable cause to acquire a second search warrant of McCool's apartment and, as a result, found that McCool had not been coerced into consenting to the search.

At McCool's bench trial and over McCool's objection, the district court admitted the drug evidence recovered during the search of McCool's apartment. As a result, the court found McCool guilty and sentenced him to two 6-month jail terms but granted McCool 12 months' probation.

McCool timely appeals.

DID THE DISTRICT COURT ERR IN DENYING MCCOOL'S MOTION TO QUASH?

A.    *Was the Search Warrant Valid*?

McCool first argues the district court erred in denying his motion to quash because the search warrant for 121 West 15th failed to particularly describe the place to be searched. McCool does not assert that the officers conducted an inadequate investigation of the premises to determine the multiunit character of the building. Rather, he asks us to find the description of the place to be searched invalid because it did not sufficiently limit the search of 121 West 15th to Maxwell's unit by using Maxwell's name, the apartment's basement location, or the apartment number.

McCool's argument that the officers could have limited the description of the place to be searched to the basement location and Maxwell's name may have merit. However, McCool did not include the search warrant and the supporting affidavit in the record on appeal, making our review impossible because we cannot conclusively determine if the description of the place to be searched was particularly described. Based on Kansas caselaw, these documents are essential to the determination of whether the "place to be searched" was particularly described. As the appellant, McCool has the burden to furnish a record which affirmatively shows that prejudicial error occurred in the district court. Because we lack an adequate record, we must presume that the district court's ruling as to the validity of the warrant was correct. See *State v. Warren*, 302 Kan. 601, 616, 356 P.3d

6

396 (2015); *State v. Saylor*, No. 95,808, 2007 WL 2239242, at *8 (Kan. App. 2007) (unpublished opinion).

However, even if we were to determine that the search warrant was invalid because it lacked sufficient particularity, the State does not rely upon it to justify its search of McCool's apartment, rendering the issue immaterial to whether the search of McCool's apartment was proper. Instead, the State relies on McCool's consent. Accordingly, we direct our attention to that issue.

B.      *Was McCool's Consent Coerced*?

McCool argues that the taint of the illegal search warrant made his subsequent consent invalid and that Samuels coerced his consent by threatening to arrest or jail him if he did not comply. The State argues that the officers had sufficient grounds for the issuance of a new search warrant, so Samuels' threat to obtain an additional search warrant did not constitute coercion.

> "The Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights generally prohibit the warrantless entry of a person's home.' Both the federal and state constitutions provide that the privacy interest in a person's home requires special deference and is entitled to unique sensitivity. *United States v. Martinez-Fuerte*, 428 U.S. 543, 561, 565, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976); *State v. Platten*, 225 Kan. 764, 769, 594 P.2d 201 (1979); *State v. Blair*, 31 Kan. App. 2d 202, 206, 62 P.3d 661 (2002).
> . . . .
> "[T]he touchstone of our analysis under the Fourth Amendment is always the reasonableness, under all the circumstances, of the particular governmental invasion of a citizen's personal security. The reasonableness depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. [Citations omitted.]" *State v. Thompson*, 37 Kan. App. 2d 589, 592-93, 596-97, 155 P.3d 724 (2007).

7

Any warrantless search is per se unreasonable unless it falls within any of the exceptions to the search warrant requirement recognized in Kansas, one of which is consent to the search. *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014). "A valid consent requires two things: (1) There must be clear and positive testimony that consent was unequivocal, specific, and freely given and (2) the absence of duress or coercion, express or implied." *State v. James*, 301 Kan. 898, 909, 349 P.3d 457 (2015). "The State has the burden of establishing the scope and voluntariness of the consent to search. These questions present issues of fact which appellate courts review to determine if substantial competent evidence supports the trial court's findings." *State v. Thompson*, 284 Kan. 763, 776, 166 P.3d 1015 (2007).

1.     *McCool's consent was not coerced by threat to obtain a warrant.*

The district court determined that McCool's consent was valid based on the Kansas Supreme Court's holding in *Brown*, 245 Kan. 604, Syl. ¶ 1. According to the district court, Samuels acted properly in informing McCool that if he failed to cooperate, he would be forced to get a new search warrant and search his apartment. The district court did not address the second part of McCool's argument, that McCool's consent was coerced because he was threatened with arrest and jail.

In *Brown*, our Supreme Court discussed the difference between a law enforcement officer's impermissible threat to *obtain* a warrant versus a permissible threat to *seek* a warrant and admitted that the difference is subtle at times. At its foundation, an impermissible threat to *obtain* a warrant conveys that a "warrant will automatically be issued," whereas, a permissible threat to *seek* a warrant communicates that there may be a "delay necessary to obtain a search warrant" and that the issuing judge may have some discretion in determining whether to grant the warrant. 245 Kan. at 607-08 (quoting 2 LaFave, Search and Seizure § 8.2[c] [1978] [quoting *United States v. Faruolo*, 506 F.2d 490, 497 (2d Cir. 1974) (Newman, D.J., concurring)]). Our Supreme Court also stated

8

that the officer must have probable cause to make the threat to obtain a warrant permissible:

> "Generally, a threat to obtain rather than a threat to seek a search warrant will invalidate a subsequent consent if there were not then grounds upon which a warrant could issue. If a law enforcement officer states that a search warrant can be obtained and, in fact, there are grounds for the issuance of a warrant, the statement is correct and does not constitute coercion. However, law enforcement officers act at their peril in threatening to obtain a search warrant unless probable cause actually exists." 245 Kan. at 612-13.

The *Brown* court found that the officers made a permissible threat to obtain a warrant because the officers were applying for a search warrant and had informed the defendant of that fact. 245 Kan. at 606, 612-13. Moreover, the defendant testified that he understood that the officers had begun the process of obtaining a warrant.

Here, it is unclear from Samuels' and McCool's testimony whether Samuels indicated he needed to obtain another warrant to search McCool's apartment. Samuels stated that he premised the subsequent search of McCool's apartment on "the search warrant." Samuels testified as follows:

> "Q. [by defense counsel] Did you give some consideration to whether or not you should have sought to obtain a second search warrant?
>
> "A. [by Deputy Samuels] I did. And I—I talked briefly with individuals in the house. I gave them as much consideration—I told them that—that this search warrant that I had in my hand should have been for Apartment No. 3 and that—I apologized that I was—
>
> . . . .

"A. The downstairs, southeast one. I'd spoke with 'em, said that because their roommates are selling weed, it's getting them in trouble. I felt bad for them. I'd allowed some of the visitors that were in that apartment to leave.

"Q. Okay.

"A. They had told me that they had marijuana in their room and that they smoked marijuana. I told them that I would get all of that as soon as we were done . . . ."

During cross-examination, Samuels also testified:

"Q. [by the State] And you didn't go get another search warrant, because after you talked to him, he said, essentially, I'll go get it?

"A. [by Deputy Samuels] Everybody was very cooperative upstairs and I did not want to push—it was [a] messed up ordeal and I didn't want to push the issue. I had everything I needed to go get another search warrant, but I did not. At that point in time, they were being cooperative. I did not see them being charged, so I simply did it the way we did it to keep the house covered while Officer Vortherms was conducting that other search warrant. Yes, they were very cooperative and everything was consensual upstairs. If they would have told me that I couldn't go get it, I probably would have went and got another search warrant."

McCool testified that Samuels apologized for the search warrant but that Samuels appeared to serve that same warrant upstairs:

"A. [by McCool] After he got us all in the main part of the kitchen area of the apartment, I believe he waited for the downstairs to be secured . . . , and basically after that, he did apologize that, you know, he realized that it was multiple apartments, but he basically continued in serving the warrant upstairs.

10

"Q. [by defense counsel] Okay. Now, he indicated that you voluntarily consented to and you showed him the location of various drugs or paraphernalia, do you contend that that was a voluntary action?

"A. It became a voluntary action. He basically said if they had to search for anything that we would go to jail that night or go to the police station.

"Q. So, if you didn't cooperate, you would have to go to jail?

"A. Yes."

From this record, we find it difficult to see any threat to obtain a second warrant. Perhaps it was an implied threat. McCool stated he believed Samuels was continuing to serve the initial warrant, and Samuels' own testimony supports McCool's belief. However, we see other possible threats. Samuels testified that he told everyone upstairs "that because their roommates are selling weed, it's getting them in trouble," and that because they had admitted to smoking and having marijuana, he would recover that evidence once he was done downstairs. McCool testified that he felt he would be going to jail if he did not cooperate. It appears that McCool was presented with the option—consent to the search now or go to jail if Samuels was forced to conduct an involuntary search.

Even if the evidence supports an implied threat to obtain a second warrant, we agree with the district court that such a threat was not coercive because Samuels had probable cause to obtain a second warrant to search McCool's apartment due to the fact that Samuels smelled burnt marijuana upon his entrance into the house and McCool's confession to smoking and possessing marijuana in his apartment. Moreover, McCool never testified that any threat to obtain a second warrant coerced him. He testified it was the threat of jail that made him think he had no choice but to agree to Samuels' search of

11

his apartment. Accordingly, we agree with the district court's finding that McCool's consent was not coerced by any alleged threat to obtain a second search warrant.

2.    *McCool's consent was coerced by law enforcement's threat of arrest and jail.*

Instead, as we have suggested above, it appears that McCool's consent was coerced by Samuels' threat to arrest and jail him if he did not consent to a search. Although McCool raised this issue before the district court and raises it again before us, the district court never addressed the matter in its ruling denying McCool's motion to quash, and the State fails to address the issue in its brief. The State's failure to offer any argument on this point, given its burden to prove that the search was lawful, tempts us to deem the State's position as conceding the point.

Reviewing whether consent is voluntarily and freely given "presents a factual question which is dependent upon the totality of the circumstances, including the individual's mental state." *State v. Grado*, No. 114,120, 2017 WL 945459, at *6 (Kan. App. 2017) (unpublished opinion); see *State v. Richard*, 300 Kan. 715, 729, 333 P.3d 179 (2014); *State v. Spagnola*, 295 Kan. 1098, 1107, 289 P.3d 68 (2012) (citing *United States v. Drayton*, 536 U.S. 194, 207, 122 S. Ct. 2105, 153 L. Ed. 2d 242 [2002]; *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 136 L. Ed. 2d 347 [1996]).

"'Consent' that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse." *Florida v. Bostick*, 501 U.S. 429, 438, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991).

"'[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter

how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed. . . .

"'. . . In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.' *Schneckloth*, 412 U.S. at 228-29." *Spagnola*, 295 Kan. at 1108.

To help courts determine the voluntariness of a consent, our Supreme Court has identified a nonexclusive and nonexhaustive list of objective factors. *Thompson*, 284 Kan. at 811-13.

"These factors, which are similar to those used to determine whether a police-citizen encounter was consensual, include (1) the threatening presence of several officers, (2) an officer's display of his or her weapon, (3) some physical touching of the person, (4) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, (5) the prolonged retention of an individual's personal effects, (6) a request to accompany the officer somewhere, (7) interaction in a nonpublic place, (8) absence of other members of the public, or (9) the display of emergency lights. *Thompson*, 284 Kan. at 811. None of these factors, however, are 'legally determinative, dispositive, or paramount.' *Reiss*, 299 Kan. at 299." *Grado*, 2017 WL 945459, at *6.

In *City of Dodge City v. Webb*, 50 Kan. App. 2d 393, 400, 329 P.3d 515 (2014), our court explained that law enforcement's "threat of consequences" may render consent invalid:

"[W]hen 'consent is obtained by threat of consequences without justification in law, such consent cannot be said to be voluntary.' *State v. Brunner*, 211 Kan. 596, 604, 507 P.2d 233 (1973), *disapproved in part on other grounds by State v. Murry*, 271 Kan. 223, 21 P.3d 528 (2001); but see *City of Kingman v. Lubbers*, 31 Kan. App. 2d 426, 428, 65 P.3d 1075 (2003) (when consent is obtained after informing a driver of actual legal

13

consequences, the consent, if freely given, is valid), *rev. denied* 276 Kan. 967 (2003); see also *Brown*, 245 Kan. at 606 (when warrantless search is justified by consent, consent must be voluntarily, intelligently, and knowingly given)."

In *Grado*, 2017 WL 945459, at *4, the defendant challenged the officer's statements as rendering his consent invalid because the statements regarding "'the possible consequences of drugs being found in the [hotel] room'" were misleading. In addressing Grado's argument, our court discussed how law enforcement's use of "deceit, trickery or misrepresentation" can negate a voluntary consent to search:

"A law enforcement officer's resort to deceit, trickery, or misrepresentation may vitiate the voluntariness of a consent to search. *People v. Cardenas*, 237 Ill. App. 3d 584, 588, 604 N.E.2d 953 (1992). See 4 LaFave, Search & Seizure: A Treatise on the Fourth Amendment §§ 8.2(m), 8.2(n), pp. 166, 176 (5th ed. 2015). An officer's use of such tactics standing alone, however, will not invalidate an otherwise voluntary consent. Rather, it is but one factor to be considered in assessing the totality of the circumstances. See *People v. Zamora*, 940 P.2d 939, 942 (Colo. App. 1996); *Miami-Dade Police Department v. Martinez*, 838 So. 2d 672, 674-75 (Fla. App. Dist. 2003).

"Caselaw from other jurisdictions indicates that informal promises of leniency or immunity and comments which subtly create a belief that there will be limited or no consequences if the defendant consents to a search may impact the voluntariness of a consent and, thus, such comments may be considered among the totality of the circumstances. See, e.g., *State v. Lowe*, 812 N.W.2d 554, 574-75 (Iowa 2012) (although officers told defendant that they were not interested in charging her, a subtle form of deception, an officer's use of deception to gain consent to search is but one factor in the analysis and the circumstances indicated that defendant's consent was otherwise voluntary); *State v. Reinier*, 628 N.W.2d 460, 469 (Iowa 2001) (defendant's consent to search was involuntary because the officers used a subtle form of deception with no reasonable basis, *i.e.*, they told defendant that they were looking for "'meth labs'" and "'major dealers,'" which tended to minimize the seriousness of possessing drugs for personal use or casual sales and created a false belief that no adverse consequences would result if a small quantity of drugs was found)." 2017 WL 945459, at *7.

14

See also *Thompson*, 37 Kan. App. 2d at 596-97 (consent coerced because of repeated requests to search; negative implication from officer's promise not to take defendant to jail).

Here, according to McCool's testimony, Samuels told McCool he would not go to jail that night if he consented to a search of his apartment, reasonably reflecting a promise or an implied promise of a lesser consequence by consenting to the search. Samuels testified, "I collected all of that stuff, told all of them that they were not going to go to jail, that they might get a ticket in the mail or something, and then went back downstairs." Samuels' testimony supports the proposition that McCool's cooperation ensured that he would not go to jail that evening and that they might not even be charged as Samuels also testified that he did not see them getting charged.

When viewing the totality of the circumstances, we agree with McCool that he was coerced into consenting to the search of his apartment. First, Samuels entered McCool's apartment under a search warrant that he later admitted was overbroad even though McCool testified that he tried to tell Samuels upon his initial entry that the home was divided into multiple units. Second, McCool's testimony suggests he wanted to refuse Samuels' request as he asked for a copy of the warrant. Third, after Samuels gathered everyone into the upstairs kitchen, McCool was faced with the prospect of either consenting to a search or going to jail. Fourth, Samuels made statements suggesting the search was compulsory based on (1) his statement that because of Maxwell's drug activity, the people upstairs would also be getting into trouble, and (2) that if they did not consent, they would go to jail. Fifth, Samuels' jail threat gave the appearance that McCool did not have much choice about whether to deny the request. See *Bostick*, 501 U.S. at 438. McCool's consent was coerced.

Given that McCool was coerced into granting consent to a search of his apartment, and because the State made no argument before the district court and makes no argument

15

before us that the evidence would have been inevitably discovered, we find that the district court erred in failing to suppress the evidence contained in McCool's apartment. Accordingly, we must reverse McCool's convictions, vacate his sentences, and remand the case to the district court with instructions to suppress the evidence obtained from the search of McCool's apartment.

Reversed, vacated, and remanded with directions.