No. 94,609

STATE OF KANSAS, *Appellee,* v. LAFAYETTE D. E. COSBY,
*Appellant.*
(169 P.3d 1128)

Opinion filed November 9, 2007.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Ann L. Smith*, of Lenexa, argued the cause, and *Charles Branson*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: In the early morning hours of April 4, 2004, seven individuals witnessed defendant Lafayette Cosby fatally shoot Robert Martin. The contested issue at trial was whether defendant shot Martin while attempting to defend his friend, Alrick "Tin Tin" Johnson. In this appeal from his jury conviction of premeditated first-degree murder, defendant argues that the district judge erred by admitting a statement made after defendant invoked his right to speak with an attorney and in allowing the State to inform the jury that defendant had invoked that right. He also argues that the district judge erred by permitting the State to present testimony attacking defendant's character; that the prosecutor committed reversible misconduct by suggesting to the jury that premeditation can occur instantaneously; and that cumulative errors denied him a fair trial.

## Factual and Procedural Background

The day before the crime began with celebration: Defendant and his roommate, Bouba Sembene, went to Kansas City, Missouri, to take part in a Senegal Independence Day event. Defendant

made arrangements to meet Johnson back at the men's apartment in Lawrence later that night to have drinks and make music. Defendant also invited his downstairs neighbor, Vanessa Engelbert, and her friends, Andrea "Star" Garrison and Chad Davis.

When defendant and Sembene returned to the apartment from Kansas City, Johnson was already there with his girlfriend, Brianna Moten. Mamadou Drame, a third roommate, arrived later. Garrison arrived at about 1 a.m. She received a call from Davis to meet her in the parking lot; Martin was with Davis. After a brief trip to see Martin's girlfriend, they entered defendant's apartment, where defendant greeted them. Engelbert then joined the gathering.

Martin had a reputation as a "drug dealer" and a history of violence. He had been using cocaine and marijuana earlier that evening. After Martin asked to use defendant's restroom, defendant showed Martin where it was located—in the back of the apartment between two bedrooms.

Johnson expressed concern to defendant about Martin. Martin was dating Johnson's foster sister, Kim Foster. Several months before, Martin and Foster had visited Johnson's house, and Johnson had witnessed them fighting. Ultimately, Johnson had refused to help Martin, and the police eventually took Martin to jail. This was the last time Johnson had seen Martin, and Johnson was worried Martin might want to settle a score with him.

Defendant, aware of this Johnson-Martin history, went to the back of the apartment and waited so that he could talk to Martin when he came out of the restroom. When Martin came out, he said to defendant, "You got to follow me around?" Defendant tried to explain that it was awkward for Martin to show up uninvited and that he was concerned that Martin did not like Johnson. Defendant wanted to be sure any problem Martin had with Johnson would not be revisited that night, but Martin was vague in his responses, saying there are always "repercussions" for actions.

Defendant testified that this conversation took place in the hallway of the apartment, but Davis testified that, when he went to check on the men, he saw them in the back bedroom, laughing; defendant was lying on the bed, and Martin was sitting on the floor.

The men rejoined the gathering in 15 to 20 minutes. Martin sat in a chair opposite the couch where Johnson, Moten, and Engelbert were sitting. After about 5 minutes, Martin went over to the couch and patted Johnson on the shoulder to get him to make room next to him. Martin then squeezed himself between Johnson and Engelbert on the couch. Johnson remembered that Martin then turned away and began talking to Davis and Garrison.

Defendant testified that he was watching Martin closely because he was still concerned about what Martin might do. He saw Martin fidgeting with his coat, and he testified that he saw a gun under the coat.

Upon seeing the gun, defendant went to a back bedroom and retrieved his own gun. He then went to the kitchen, from which he was able to watch Martin. Martin had turned toward Davis and Garrison and, defendant testified, he was manipulating the gun in his coat.

Garrison testified that Martin was using his hands as he was talking. Johnson, Engelbert, and Davis testified that they did not see Martin with a gun.

Johnson turned to say something to Moten, just as Martin turned toward Johnson; Defendant said he saw the barrel of Martin's gun sticking out from Martin's coat. Defendant came into the room and shot Martin. Martin fumbled with his coat, and defendant thought he was trying to get his gun to fire back. Defendant then shot Martin three more times.

When the shots were fired, most of the others ran outside. While running past defendant, Davis heard him say, "The mother fucker tried to kill me." Sembene ran back and hid in his room. He heard defendant telling Martin that Martin needed to accept Jesus.

Defendant heard Engelbert say she was calling the police, and he heard sirens. He stayed with Martin for 10 to 15 minutes, telling him police and an ambulance were on the way. Defendant then began to worry that Davis had called Martin's brother, and defendant did not want to be around if Martin's brother showed at the apartment. Defendant then left.

Johnson went back into the apartment to retrieve his backpack and then went to Davis' apartment. Engelbert, Moten, Garrison,

and Davis went to Engelbert's apartment, two floors below, where they heard sirens. Davis then had Engelbert take him home, where they met Johnson. The group went back to Engelbert's apartment and were surprised that police were not there. Drame met them at Engelbert's, and the group went back to defendant's apartment upstairs to retrieve Garrison's cell phone and Moten's shoes. While they were there, they began picking up bottles and cleaning the apartment. Drame called police after everyone left.

Police did not recover a gun from Martin's body, from his coat, or from the scene; nor did police collect Martin's coat or test it for gun oil residue.

Defendant, meanwhile, walked around Lawrence, and, about daylight, threw his gun into a creek or pond. He eventually walked to a church in West Lawrence. After the service, he walked almost all the way to Topeka, where he was picked up by a passing motorist and dropped at the home of some friends. He stayed with those friends for a couple of hours and then walked around Topeka, until he was picked up by the Topeka police on the evening of April 5, 2005. The State's complaint, charging first-degree premeditated murder, was filed that day.

Detectives M.T. Brown, John Hanson, and Amy Jumisko of the Lawrence Police Department met with defendant in an interview room at the Topeka police station. After obtaining preliminary information, Brown gave defendant *Miranda* warnings. See *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966). Defendant said he understood his rights. He also said he did not want to speak with the detectives and wanted to consult with a lawyer first. Brown then asked defendant where the gun was and if it was in a safe place. Defendant said that it was, and Brown did not ask any more questions. On the drive from Topeka to Lawrence, however, the defendant made comments and statements to law enforcement.

Defendant moved to suppress his statements. At the hearing on his motion, the State called Brown, who testified that when he met defendant in Topeka, he did not say the detectives were investigating a homicide. Brown said defendant was not restrained and he did not appear to be under the influence of drugs or alcohol.

He also appeared to understand English and his rights. When asked whether he was willing to waive those rights and talk, defendant said he wanted to speak to a lawyer first. After defendant responded to Brown's question about the gun, Brown informed defendant that he was going to be transported to Lawrence. Defendant then volunteered: "I do want you to know this: I will say I didn't want this to happen. I will say that." Defendant declined to give a written statement at that time. This initial meeting had lasted roughly 20 minutes.

Jumisko testified that she observed, but did not participate in, the meeting between defendant and the two other detectives at the Topeka police station. She confirmed that defendant received *Miranda* warnings, asked for a lawyer, and then responded to Brown's question about the gun. She also testified that, during the trip to Lawrence, she and Hanson did not plan to ask any questions of defendant. However, after about 10 minutes of silence, defendant began to volunteer information and Jumisko got out a pen to record his comments. Throughout the drive, according to Jumisko, defendant was calm and polite.

According to Jumisko's notes, defendant said, "I am not a killer." Hanson responded, "But someone is dead." Defendant repeated, "I am not a killer," and then asked if police had "found the gun" on Martin. Hanson told defendant they could not discuss anything with him because he had asked for an attorney. After a short time, defendant asked, "How's [Martin's] family?" Hanson replied, "Not good."

Defendant made several more statements, punctuated by pauses, to which the police did not respond. He said, "I walked all the way to Topeka and a friend gave me the clothes and they knew the situation"; "Met a man walking on the street where I was arrested. We walked a long time and talked"; and "I went to a liquor store and got picked up on the very next block." Defendant said he planned to drink a bottle of wine before facing the charges, and said, "I went to church." Hanson then laughed and said, "We heard." Defendant replied, "I thought you would be waiting outside for me," and "A couple of cops passed me when I walked out of the church." Hanson told defendant that, if he wanted to explain

the situation, he needed to talk to an attorney and then let the police know.

After more silence, defendant said, "Nobody knows what happened, just me and Rob." Then, after several minutes, defendant said, "Based on what they thought they saw, but not before." This statement was never clarified, and defendant said nothing else before he arrived at the Douglas County Jail.

The State argued at the suppression hearing that Brown's one question concerning the whereabouts of the gun after defendant received *Miranda* warnings and invoked his Fifth Amendment right to have counsel present during interrogation was permissible under a "public safety exception" recognized in *New York v. Quarles*, 467 U.S. 649, 81 L. Ed. 2d 550, 104 S. Ct. 2626 (1984). Defendant's subsequent statements, the State asserted, were voluntary and unsolicited; no evidence suggested the comments were initiated by the officers, and the officers responded appropriately by reminding defendant they could not talk with him. Defendant attempted to distinguish *Quarles*, in which officers had asked defendant about a gun before giving *Miranda* warnings.

The district judge ruled that defendant's statements were admissible. Later, at a sidebar during trial, the judge affirmed this ruling and further ruled, over objection, that the witnesses could explain that their unwillingness to follow up on defendant's statements was attributable to defendant's invocation of his rights.

Pretrial, the State had filed a motion in limine to prevent defendant from introducing evidence of the victim's prior convictions, arguing character evidence about the victim was irrelevant because the defendant's claim of self-defense was not supported by the evidence. The State also argued that, even if evidence would justify a self-defense instruction, the victim's reputation for violence could only come into evidence through general opinion testimony, not through prior convictions or specific instances of conduct. At the hearing on the motion, defendant argued testimony about Martin's reputation in the community—including evidence that he had "stuck a shotgun" to someone's head, brandished guns in people's homes, "pistol-whipped" an individual, and was believed by the Lawrence police to be armed and dangerous—was relevant, ma-

terial, and indispensable to the defense theory of the case. The district judge initially took the matter under advisement but eventually ruled that, because defendant pursued a defense-of-another theory, evidence of the character of the deceased was proper and could be shown by evidence of his general reputation in the community. The judge said specific instances of conduct would not be allowed unless they were incidents that occurred between defendant and victim. The court reserved a final ruling, though, because defendant had not yet actually claimed self-defense or defense of others as an affirmative defense to the charges.

At trial, the State proffered the testimony of Anthony Wisdom, who would testify that defendant had a long-held irrational belief Martin was trying to kill him. After some discussion, the district judge ruled the proffered testimony, though possibly relevant, was too remote and its probative value was outweighed by its risk of undue prejudice. The State renewed its proffer on at least one occasion, and the judge refused to change his ruling.

Defendant testified at length at trial, discussing his relationship with Martin. He knew Martin had recently served time in prison, believed Martin was dangerous and unpredictable, and had witnessed Martin turn on one of his own friends, beat him "to the ground," and then hug him. Defense counsel asked defendant, "What was going through your mind and what was your perception about why you acted or reacted the way that you did?" Defendant responded:

> "The only way I can answer that question is to—is I can't answer your question unless you know Robert Martin. You just have to know who he is and have to know his lifestyle and have to know his personality . . . . It was him. It's who he was and that is why I reacted, you know, as far as his personality and as far as his character."

On cross-examination, the prosecutor asked defendant whether he believed Martin had been trying to hurt him for some time, and defendant said no. The prosecutor then asked, "Isn't it true that you believe, and you believed . . . that Robert Martin had been trying to kill you for five years?" Defendant answered, "That is absolutely false and I am sorry that you even said that to the jury." Defense counsel objected, and the district judge overruled the ob-

jection. Further, the judge permitted the State to question defendant about Wisdom's proffered testimony, portions of which defendant denied.

The State then called Wisdom as a rebuttal witness. He testified that he, Martin, and defendant had all been good friends for 10 or 11 years. Five years earlier, he and defendant had eaten hallucinogenic mushrooms and were working on music when Martin stopped by; the three talked about getting more mushrooms. Suddenly, defendant demanded that Wisdom take him home. When Wisdom dropped defendant off, defendant accused Wisdom and Martin of trying to kill him. Wisdom testified that he talked to defendant a number of times over the next few years about the accusation; defendant remained convinced Martin "had tried to kill him" and was still trying to kill him. Defendant, according to Wisdom, believed Martin was "the devil" or had the devil "in him."

During closing argument, while discussing the element of premeditation, the prosecutor told the jury:

"[Y]ou all might have your own ideas about that [legal concept, but] this is what the law tells you. 'Premeditation: To have thought over the matter beforehand.' So it's not an intricate plan and you don't have to find that Lafayette Cosby planned to kill Robert Martin prior to Robert Martin getting there that night. You don't have to find that Lafayette Cosby planned to kill Robert Martin prior to going back to the room to get his gun. You just have to find that he thought it over beforehand, even if that was instantaneous."

The defense immediately objected. The judge sustained the objection but also said, "[T]hat is for the jury to decide." The prosecutor then repeated the correct definition of premeditation as "thinking the matter over beforehand."

### Admission of Defendant's Statement About Gun

The defendant argues that the district judge erred by admitting defendant's statement that the gun was in a safe place. In his view, Brown's question about the whereabouts of the gun, which followed defendant's invocation of his *Miranda* rights, was not excused by a *Quarles'* public safety exception because there were no exigent circumstances and *Quarles* applies only to pre-*Miranda* statements.

The parties set forth slightly different standards of review on this issue. The State suggests that, when a district court has conducted a full hearing on the admissibility of a statement and determines that it was freely, voluntarily, and intelligently made, this court should uphold the determination if there is substantial competent evidence to support it.

This standard is incomplete. First, the district court did not admit the statement because it was freely, voluntarily, and intelligently made. It admitted the statement because it determined that "there was a legitimate concern for public safety that fit the *Quarles* scenario."

Defendant is correct that, when reviewing a district judge's suppression decision on an accused's statements, the factual underpinnings of the decision are reviewed for substantial competent evidence, but the ultimate legal decision drawn from those facts is reviewed de novo. *State v. Mattox*, 280 Kan. 473, 480, 124 P.3d 6 (2005); *State v. Walker*, 276 Kan. 939, 944, 80 P.3d 1132 (2003). We do not reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Swanigan*, 279 Kan. 18, 23, 106 P.3d 39 (2005).

The district judge found that Brown considered it dangerous that the gun used in the homicide had not been located. Defendant had walked throughout Lawrence and Topeka, and the gun could have been anywhere, meaning a child might find it and more people could be harmed. The district judge regarded the concern as reasonable, and, although it would have made more sense for Brown to ask defendant about the gun before *Miranda* warnings were given, the judge did not "see anything or know of any cases that indicate that the sequence has to be a certain order. . . . I have some concern with the time gap . . . [but it] is not an issue that the court can consider as long as there was a legitimate concern for public safety." There is substantial evidence in the record to support the district court's findings of fact about Brown's worry over the gun, but the ultimate legal question of whether a public safety exception applies requires our independent review. See *Mattox*, 280 Kan. at 480.

The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during a custodial interrogation and the right to remain silent. U.S. Const. amend. V; *Miranda,* 384 U.S. at 479. *Miranda* requires law enforcement to inform suspects of these rights before statements, exculpatory or inculpatory, made in a custodial interrogation can be admitted against them; *Miranda,* 384 U.S. at 444; but *Miranda's* rules are procedural safeguards; they are not constitutional rights themselves. *Michigan v. Tucker,* 417 U.S. 433, 444, 41 L. Ed. 2d 182, 94 S. Ct. 2357 (1974).

In *Quarles,* 467 U.S. 649, the United States Supreme Court recognized an exception to *Miranda* in situations involving a threat to public safety. In that case, a woman reported that she had just been raped by an armed man who had escaped into a supermarket. The officers apprehended a suspect, noticing he had an *empty* shoulder holster. Without first advising him of his rights, an officer asked the suspect where the gun was. The suspect directed police to the gun behind some nearby empty cartons, and the statement was admissible because the need to ascertain the location of a potential danger to the public outweighed the need for the "prophylactic rule" of *Miranda. Quarles,* 467 U.S. at 657.

Our courts have recognized the public safety exception expressed in *Quarles* and have applied it in pre-*Miranda* situations where there is an immediate need for an officer to protect himself or herself or the public. For example, in *State v. McKessor,* 246 Kan. 1, 7, 785 P.2d 1332, *cert. denied* 495 U.S. 937 (1990), we determined that a gun seized during a valid warrantless arrest of defendant in his motel room was admissible under the public safety exception, where police officers had asked the defendant about the location of the gun before reading him the *Miranda* warnings. In that case, officers had reason to believe that the defendant was armed, that an accomplice was in the bathroom, and that adjoining motel rooms were occupied. Public safety demanded determination, without delay, of the location of any weapons in the room.

We have applied the public safety exception in other pre-*Miranda* situations as well. See *State v. Drennan,* 278 Kan. 704, 722-724, 101 P.3d 1218 (2004) (where officers had reasonable belief

potential victim might be in danger, in need of assistance, officers justified in asking suspect about victim's whereabouts before reading suspect *Miranda* rights); *State v. Bailey*, 256 Kan. 872, 880, 889 P.2d 738 (1995) (officer's question about whereabouts of gun occurred after high-speed chase, report defendant was suspect in shooting; question fell within "public safety" exception); see also *State v. Ewing*, 258 Kan. 398, 404, 904 P.2d 962 (1995) (declining to discuss "persuasive" argument that public safety exception applied to pre-*Miranda* questioning where error in admission of statement harmless).

Once the right to have counsel present during interrogation has been invoked, the courts impose a relatively rigid requirement that interrogation must cease. Questioning can be resumed only after a lawyer has been made available or the suspect reinitiates conversation. *Edwards v. Arizona*, 451 U.S. 447, 482, 484-85, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981); *State v. Henry*, 273 Kan. 608, 613, 44 P.3d 466 (2002). This rule provides a second layer of prophylaxis for the *Miranda* right to counsel, designed to prevent police from badgering a defendant into waiving previously asserted rights. *Michigan v. Harvey*, 494 U.S. 344, 350, 108 L. Ed. 2d 293, 110 S. Ct. 1176 (1990); *Mattox*, 280 Kan. at 481; *State v. Walker*, 276 Kan. 939, 944-46, 80 P.3d 1132 (2003).

Here, it is undisputed that defendant was in custody at the time his challenged statement was made; his invocation was clear and unambiguous; and he did not waive his asserted right to counsel by responding to Brown's question concerning the whereabouts of the gun. A valid waiver of a previously asserted right cannot be established by showing only that the suspect responded to further police-initiated custodial interrogation, even if the suspect has been advised of his rights. *Edwards*, 451 U.S. at 484. The question that remains is one of first impression in Kansas: Can an officer's response-provoking question meet the public safety exception expressed in *Quarles* and applied in *McKessor* if it is posed after *Miranda* warnings are given and after defendant invoked the right to have an attorney present during questioning?

There is a split of authority on this issue. See *United States v. Mobley*, 40 F.3d 688, 692 (4th Cir. 1994), *cert. denied* 514 U.S.

1129 (1995) (public safety exception applies both before, after administration of *Miranda* warnings, right to counsel is invoked; however, absent circumstances posing objective immediate danger to public, police, need for exception not apparent; suspicion questioner on fishing expedition outweighs belief public safety motivated otherwise improper questioning); *United States v. DeSantis,* 870 F.2d 536, 541 (9th Cir. 1989) (even if accused has been advised of rights and invoked those rights, public safety exception applies with equal force as long as there remains objectively reasonable need to protect officers, public from immediate danger associated with weapon); *Trice v. United States,* 662 A.2d 891, 894-97 (D.C. 1995) (detective's question after defendant's assertion of right to counsel within public safety exception, although arrest, questioning occurred 4 days after shooting; detective waited 1 hour after arrest to ask question at police station rather than at defendant's home; strong circumstantial evidence gun at defendant's home; several small children in defendant's home at time of arrest); *Borrell v. State,* 733 So. 2d 1087, 1089 (Fla. Dist. App. 1999) (police called to scene immediately after shooting; unarmed defendant surrendered within minutes; circumstances demonstrate "an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon"); see also *State v. Davis,* 1999 WL 1050092, unpublished opinion of Ohio Court of Appeals filed November 19, 1999, *rev. denied* 88 Ohio St. 3d 1433, 724 N.E.2d 809 (2000) ("public safety" exception extends to certain narrow circumstances where suspect informed of *Miranda* rights, invokes right to counsel; here, appellant undeterred by *Miranda* warnings, voluntarily gave location of weapon); compare *United States v. Anderson,* 929 F.2d 96, 98-102 (2d Cir. 1991) (public safety does not justify deceptive, coercive tactics; suspect had been read *Miranda* rights; agent coerced suspect saying he would lose opportunity to cooperate if attorney sought); *State v. Pante,* 325 N.J. Super. 336, 346, 739 A.2d 433 (1999), *cert. denied* 163 N.J. 76, 747 A.2d 285 (2000) (defendant revealed location of explosives after continued post-*Miranda* interrogation; public safety exception does not justify questioning after right to counsel invoked); *State v. Harris,* 199 Wis. 2d 227, 247, 544 N.W.2d 545

(1996) (public safety exception cannot excuse questioning after right to counsel invoked); see also *People v. Zanini,* 2003 WL 103464, unpublished opinion of California Court of Appeals filed January 10, 2003 (appellant arrested, taken to police station, given *Miranda* warnings; appellant invoked rights; officer subsequently mentioned concern about public safety; appellant again stated he did not want to incriminate himself; officer then implied anything appellant said would not be used to incriminate appellant; defendant's statements inadmissible).

We decline to weigh in on this conflict among the various federal and state courts, because a narrower ground for our decision exists in this case. Even if the district judge erred in admitting defendant's statement about the gun, the error was harmless. See *Ewing,* 258 Kan. at 404 (declining to discuss *Quarles* exception; any error harmless). Defendant never disputed that he killed the victim with his gun. Seven persons saw him do so. Evidence that defendant knew the location of the gun after the shooting was of no probative value to the jury on the true contested issue at trial: defendant's intent or justification for killing Martin. Under these facts, we are convinced that the district judge's admission of defendant's statement concerning the whereabouts of the gun was harmless beyond a reasonable doubt. See *Chapman v. California,* 386 U.S. 18, 22, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967); *State v. Thompkins,* 271 Kan. 324, 335, 21 P.3d 997 (2001).

### *Reference to Defendant's Invocation of Rights*

Defendant next argues that the State's introduction of evidence about his invocation of rights violated *Doyle v. Ohio,* 426 U.S. 610, 618, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). He characterizes this error as one of prosecutorial misconduct, because the prosecutor used admissible evidence of his voluntary statements during the ride to Lawrence to open the door to inadmissible evidence of the earlier invocation of rights, and made improper comments designed to impeach defendant's credibility. We agree.

Generally, it is constitutionally impermissible for the State to elicit evidence at trial of an accused's post-*Miranda* silence. *Doyle,* 426 U.S. at 618; see *State v. Gadelkarim,* 256 Kan. 671, 685, 887

P.2d 88 (1994). A *Doyle* violation occurs when the State attempts to impeach a defendant's credibility at trial by arguing or by introducing evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name, instead invoking the constitutional right to remain silent. *State v. Brinkley,* 256 Kan. 808, 820, 888 P.2d 819 (1995). The *Doyle* rule also applies when the State attempts to impeach a defendant's credibility by arguing that the invocation of his or her right to counsel evidences guilt. See *Doyle,* 426 U.S. at 618; *State v. Edwards,* 264 Kan. 177, Syl. ¶ 8, 955 P.2d 1276 (1998).

As mentioned, at the hearing on defendant's motion to suppress, and again at the sidebar during trial, the defense objected to the admission of the fact that defendant had invoked his rights, but the district judge permitted officers to tell the jury they did not follow up on defendant's unsolicited statements because of the invocation. This ruling was error; there was no need for the explanation the officers gave. See *State v. Dumars,* 33 Kan. App. 2d 735, 747, 108 P.3d 448, *rev. denied* 280 Kan. 986 (2005) (*Doyle* violation occurs when a prosecutor elicits testimony from a detective that a defendant exercised his or her right to silence). To make matters worse, the State went beyond presenting the bare fact that defendant had previously invoked his rights. During Brown's trial testimony, after the prosecutor asked about defendant's interview in Topeka and elicited the fact that defendant invoked his rights, the following exchange occurred:

"Q. [Prosecutor:]. Now I am accurately stating that after you asked him about the gun, that you don't ask him about any other—you don't ask any other question of him?
"A. [Detective Brown:]. No.
"Q. But does he say, 'I want you to know this,' and [say] 'I didn't want this to happen'?
"A. That is right.
"Q. Did he ever tell you why it happened?
"A. No.
"Q. Did you ever stop him from telling you why it happened?
"A. No.
"Q. Did he ever mention he was defending himself and another person?
"A. No."

In addition, the prosecutor called Jumisko to testify about the substance of defendant's spontaneous statements and then asked:

"Q. Now did he at any point elaborate on any of the statements that you wrote down?

"A. No.

"Q. And if he were to—would have started talking about the circumstances under which this happened, would you have allowed him to say—tell you whatever he wanted to tell you?

"A. If he had brought it up on his own, I would have written down what he said."

This pattern continued when the prosecutor cross-examined defendant:

"Q. You agree with me that the first time that you—other than your lawyer, the first time you told anyone what you have told us here today is today; this is the first time?

"A. No, sir.

"Q. You agree that the Lawrence Police Department didn't stop you from telling them whatever you wanted to tell them; do you agree with that statement?

"A. Yes, sir.

"Q. When you went to Topeka, you said you went to a friend's house.

"A. Yes, sir.

"Q. Did you tell that friend what happened?

"A. No, sir.

. . . .

"Q. You told [the man you met walking] that you shot a person in Lawrence; correct?

"A. No, sir. I told [him] 'I killed a man last night' is what I told him.

"Q. And this is yes or no. At no point . . . did you ever tell him that you killed a man to defend yourself or another person?

"A. I didn't say anything about the incident."

When evaluating a prosecutorial misconduct claim, this court first asks whether the complained-of conduct was outside the considerable latitude given a prosecutor in discussing the evidence. *State v. Dixon*, 279 Kan. 563, 590-91, 112 P.3d 883 (2005); *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004).

We agree with defendant that the prosecutor committed misconduct with regard to defendant's invocation of his rights. In addition to "explaining" why the officers did not follow up on defendant's unsolicited statements, the prosecutor repeatedly asked about defendant's post-*Miranda* silence. We perceive no reason to

have done so, except to imply to the jury that defendant's assertion of the defense of another should not be believed. We defer for the moment our discussion of whether this misconduct necessitates reversal.

### Premeditation

Defendant also argues that the prosecutor's suggestion during closing argument that premeditation can be instantaneous also constituted misconduct that deprived him of a fair trial.

The following is the challenged argument and ensuing exchange:

"[Y]ou all might have your own ideas about that [legal concept, but] this is what the law tells you. 'Premeditation: To have thought over the matter beforehand.' So it's not an intricate plan and you don't have to find that Lafayette Cosby planned to kill Robert Martin prior to Robert Martin getting there that night. You don't have to find that Lafayette Cosby planned to kill Robert Martin prior to going back to the room to get his gun. You just have to find that he thought it over beforehand, even if that was instantaneous. . . .

"[Defendant's Counsel]: I hate to interrupt, but I object because I don't think that is a correct statement of the law. I think the case law specifically says he can't—

"[Prosecutor]: That is a matter for them to decide.

"THE COURT: I agree with defense, but I think that is what the—I think that is for the jury to decide.

"[Defendant's Counsel]: I apologize for the interruption.

"[Prosecutor]: That is the definition of premeditation. There are some things you have to decide what they mean. You all have life's experiences and that is why you are here. 'To have thought over the matter beforehand.' You have to decide what that means. Did Lafayette think the matter over beforehand? Did he know what he was doing when he went [to get the gun and came back to the kitchen]?"

In *State v. Pabst*, 273 Kan. 658, 44 P.3d 1230, *cert. denied* 537 U.S. 959 (2002), the prosecutor's statement that "premeditation means to have thought the matter over beforehand. It's the conscious act of a person" was examined. We held this was not a misstatement of the law and thus did not qualify as prosecutorial misconduct. 273 Kan. at 661; see also *State v. Doyle*, 272 Kan. 1157, 1163-66, 38 P.3d 650 (2002) ("[s]omething can be premeditated as soon as it happens"; harmless misstatement because not purposeful; jury received proper instruction; premeditation supported by evidence); *State v. Jamison*, 269 Kan. 564, 572-73, 7 P.3d 1204

(2000) (statement that "premeditation can occur in an instant" harmless error; where jury given proper instruction, sufficient evidence of premeditation existed).

However, we sent a clear warning in *Pabst* that prosecutors must avoid forms of the word "instant" or any synonym conveying that premeditation can develop instantaneously. *Pabst*, 273 Kan. at 662. We have consistently found reversible misconduct when a prosecutor states or implies that premeditation can be instantaneous. See, *e.g.*, *State v. Morton*, 277 Kan. 575, 585, 86 P.3d 535 (2004) (prosecutor's gesture of firing gun, accompanied by statement, "That can be premeditation under the laws of the State of Kansas. One squeeze of a trigger is all it takes," implied instantaneous premeditation; misconduct reversible); *State v. Holmes*, 272 Kan. 491, 497, 499-500, 33 P.3d 856 (2001) (prosecutor said "premeditation can occur in an instant. That's the law in the State of Kansas"; deliberate misstatement constituted reversible error). Given *Pabst's* warning, the prosecutor in this case should have known better. His misstatement of the law was outside the considerable latitude given him in discussing the evidence. Again, we defer for the moment our harmless error analysis.

### Rebuttal Testimony of Tony Wisdom

The district judge twice rejected the State's proffer of Wisdom's testimony that defendant had a long-held irrational belief that Martin was trying to kill him. Relying on *State v. Mason*, 208 Kan. 39, Syl. ¶ 1, 490 P.2d 418 (1971), the district court ruled that the defense-of-another theory made the nature and character of the victim admissible by general reputation testimony. In contrast, evidence of the defendant's character would not be admissible unless defendant put his character in issue. See K.S.A. 60-447(b); *State v. Stokes*, 215 Kan. 5, 6-7, 523 P.2d 364 (1974).

During defendant's testimony, defendant discussed the victim's reputation and character, as well as specific instances of conduct he had witnessed. He suggested that Martin was wild, unpredictable, and dangerous. In response to the specific question of what was going through his mind when he acted or reacted on the night of the crime, defendant said, "Martin. You just have to know who

he is"; "It was him. It's who he was and that is why I reacted." On cross-examination, the prosecutor then asked defendant whether it was true that he believed Martin had been trying to kill him for years; defendant strenuously denied holding that belief. The district court then permitted the State to call Wisdom in rebuttal.

Defendant argues on appeal that Wisdom's rebuttal testimony was inadmissible character evidence, because defendant had not put his character in issue. He characterizes Wisdom's testimony as portraying him as a "drug-addled, delusional lunatic."

In a criminal case, evidence of the accused's character, if offered by the prosecution to prove guilt, may be admitted only after the accused has introduced evidence of his or her good character. K.S.A. 60-447(b). Generally, when a person's character or a trait of his or her character is in issue, it may be proved by testimony in the form of opinion, evidence of reputation, or evidence of specific instances of the person's conduct. K.S.A. 60-446. However, when a character trait is relevant to prove conduct on a specified occasion, the trait may not be proved by specific instances of conduct other than prior convictions. K.S.A. 60-447(a).

A defendant on trial for murder, after laying a proper foundation by evidence tending to show that he or she acted in self-defense or, as here, defense of another, may introduce evidence of the turbulent and quarrelsome character of the deceased. See *State v. Walters*, 284 Kan. 1, 10, 159 P.3d 174 (2007); *State v. Lumley*, 266 Kan. 939, Syl. ¶ 9, 976 P.2d 486 (1999). Defendant did so here. He did not introduce evidence of his own good character; he did not offer testimony that he was a law-abiding citizen or that he was peaceful and nonviolent. Defendant is correct that he did not put his own character in issue in this case.

However, defendant's argument on this issue is unavailing because Wisdom's rebuttal testimony did not constitute character evidence. Rather, it related information about events Wisdom had seen and heard. The testimony contradicted defendant's assertion that he had never said or believed Martin was after him and was proper rebuttal.

The district court, properly exercising its discretion, determined that the Wisdom testimony should be excluded from the State's

case in chief, because, although relevant and admissible, it was more prejudicial than probative. See K.S.A. 60-445. But this calculus could be revisited and a different decision reached after defendant testified. A district judge has broad discretion in determining the use and extent of relevant evidence in rebuttal, and such a ruling will not be ground for reversal absent abuse of that discretion that unduly prejudices the defendant. Generally, admission of rebuttal evidence intended to contradict facts put into evidence during the defense case is not error. *State v. Blue*, 221 Kan. 185, 188, 558 P.2d 136 (1976) (rebuttal evidence admissible under K.S.A. 60-420 to attack defendant's credibility; evidence competent to show testimony of defendant, defense witness false). We see no abuse of discretion in admission of Wisdom's rebuttal testimony here.

### Cumulative Error

Defendant's last claim in this appeal is cumulative error. Cumulative trial errors, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative effect rule if the evidence is overwhelming against a defendant. *State v. Anthony*, 282 Kan. 201, 216-17, 145 P.3d 1 (2006). The evidence on the only truly contested issue in this case, the viability of defendant's claim that he shot Martin to protect Johnson, was conflicting. Although seven persons witnessed the shooting, this aspect of the State's case was not overwhelming.

As discussed above, the admission of defendant's statement about the gun, pursuant to the public safety exception, if erroneous, was clearly harmless standing alone. Given the truly overwhelming evidence that defendant was the shooter, we do not consider it relevant to cumulative error either.

However, there were two significant errors in defendant's trial. The *Doyle* violation was due initially to the district judge's error. However, it was compounded by the prosecutor's repeated misconduct, which created a serious problem. The prosecutor's further

statement during closing that premeditation could be instantaneous also was serious.

We observe that the prejudice inquiry at the heart of the cumulative error standard mirrors the prejudice analysis applicable when prosecutorial misconduct is at issue. Given the overlay of prosecutorial misconduct in this case, we look to the *Tosh* rubric, 278 Kan. at 93, for guidance.

Under that rubric, once we discern that an error arose from prosecutorial misconduct, we are required to determine whether the error qualifies as "plain," *i.e.*, whether the prosecutor's behavior prejudiced the defendant and denied him or her a fair trial commands consideration of three factors: (1) whether the prosecutor's misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of jurors. *Dixon*, 279 Kan. at 592. None of these factors is individually controlling. Moreover, the third factor may not override the first two factors, unless the harmlessness tests of both K.S.A. 60-261 and the federal harmless error rule outlined in *Chapman v. California*, 386 U.S. 18, 22, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967), have been met. *Tosh*, 278 Kan. 83, Syl. ¶ 2.

Were we dealing with only the district judge's error in permitting the police to "explain" why they did not follow up on defendant's voluntary statements, we would be somewhat less concerned with the effect of the *Doyle* violation on the fairness of defendant's trial. A *Doyle* violation can be ruled harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 638-39, 123 L. Ed. 2d 353, 113 S. Ct. 1710, *reh. denied* 508 U.S. 968 (1993); *State v. Fulton*, 28 Kan. App. 2d 815, 820-21, 23 P.3d 167, *reh. denied* 271 Kan. 1039 (2001). But we are faced not only with the judge's erroneous admission of a limited reference to defendant's post-*Miranda* invocation of his rights. As detailed above, the prosecutor attempted to capitalize on the jury's familiarity with this invocation, asking again and again about defendant's initial failure to claim that he was protecting Johnson. These multiple instances of misconduct, coupled with the prosecutor's later misstatement of well-known law on the definition of

premeditation lead us to conclude that the misconduct was gross and flagrant and demonstrated ill will. The lack of overwhelming evidence undercutting the defense-of-another theory, when both K.S.A. 60-261 and *Chapman* are taken into account, further persuades us that this case must be reversed and remanded for new trial.

We pause only to note one additional defense argument, hoping to put it to rest.

K.S.A. 60-261 provides that no error "is ground for granting a new trial or for setting aside a verdict . . . unless refusal to take such action appears inconsistent with substantial justice." The *Chapman* formula for harmlessness of constitutional error frequently recited by this court requires reversal unless we are willing to declare a belief that it was harmless beyond a reasonable doubt. 386 U.S. at 24. Stated another way, the court must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. Thompkins*, 271 Kan. 324, 335, 21 P.3d 997 (2001).

This formulation of the federal constitutional harmless error rule has been recognized as synonymous with that set forth by the United States Supreme Court in *Fahy v. Connecticut*, 375 U.S. 85, 11 L. Ed. 2d 171, 84 S. Ct. 229 (1963). In *Fahy*, the Court said: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." 375 U.S. at 86-87; see *Chapman*, 386 U.S. at 23. In *State v. Kleypas*, 272 Kan. 894, 1084-85, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), we addressed the various statements of the *Chapman* rule, acknowledging that Kansas' use of "little, if any, likelihood of changing the result of the trial" was marginally different from *Chapman*'s "willingness to declare a belief that it was harmless beyond a reasonable doubt." However, we regarded them as equivalent to one another. *Kleypas*, 272 Kan. at 1084. Today in response to defense counsel's oral argument, we say unequivocally that neither of these formulations differs substantively or functionally from *Fahy*'s standard.

Reversed and remanded for new trial.

McFarland, C.J., concurring in part and dissenting in part: I dissent from the majority's decision reversing the conviction based on the conclusion that the prosecutor's conduct in this case prejudiced the defendant Lafayette Cosby and denied him a fair trial.

The majority's decision to reverse the conviction in this case is based heavily on the prosecutor's inquiry at trial about the defendant's failure to tell the officers that he was defending Alrick Johnson when he killed Martin. This inquiry was an effort to impeach the defendant's trial testimony with his post-*Miranda* silence, in violation of *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). There is no question that the prosecutor's inquiry was improper. The question is whether reversal is required. I believe it is not.

First, the *Doyle* violation cannot serve as grounds for reversal in this case because there was no objection at trial to the prosecutor's questions about the defendant's failure to tell the officers his exculpatory version of events. It is well settled that "[a] timely and specific objection to the challenged question or comment is necessary to preserve a *Doyle* issue for appeal. *State v. Fisher*, 222 Kan. 76, 83-84, 563 P.2d 1012 (1977)." *State v. Haddock*, 257 Kan. 964, 973, 897 P.2d 152 (1995), *overruled on other grounds State v. James*, 276 Kan. 737, 79 P.3d 169 (2003). The basis for this rule is K.S.A. 60-404, which prohibits reversal for the erroneous admission of evidence where there was no contemporaneous objection:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

The majority frames the *Doyle* issue as one of prosecutorial misconduct, which, of course, is a claim that can be raised on appeal despite a lack of objection at trial. See *State v. Miller*, 284 Kan. 682, 715, 163 P.3d 267 (2007). I understand there is a potential conflict between the contemporaneous objection rule of K.S.A. 60-404 and our rule allowing prosecutorial misconduct claims to be raised for the first time on appeal. See *State v. Hernandez*, 284

Kan. 74, 79, 159 P.3d 950 (2007) (recognizing the potential conflict but finding it unnecessary to address it as there was a contemporaneous objection to the alleged *Doyle* violations). I do not believe, however, that the contemporaneous objection rule can be avoided by characterizing what is essentially a complaint concerning the admission of evidence of the defendant's post-*Miranda* silence as prosecutorial misconduct. There is no claim in this case that the prosecutor violated *Doyle* during closing arguments.

The purpose of the rule requiring a timely and specific objection is to give " 'the trial court the opportunity to conduct the trial without using the tainted evidence, and thus avoid possible reversal and a new trial.' " *State v. Moore*, 218 Kan. 450, 455, 543 P.2d 923 (1975). By failing to lodge a *Doyle* objection at trial, the defendant failed to take advantage of the opportunity to avoid prejudice from the admission of evidence of his post-*Miranda* silence and, thus, has waived the right to claim prejudice on appeal.

Second, even if the *Doyle* violation is properly before us, reversal is not required as the error was harmless under the facts of this case.

As noted above, there is no question that the prosecutor's inquiry was improper. Therefore, the first step of the *Tosh* prosecutorial misconduct analysis is met. *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004). Under the second step of the prosecutorial misconduct analysis, an appellate court considers three factors in determining whether reversal is required:

"(1) whether the conduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 (inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, [22,] 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial), have been met." *State v. White*, 284 Kan. 333, Syl. ¶ 2, 161 P.3d 208 (2007).

Applying the third factor, the majority concludes that the evidence was not overwhelming: "The lack of overwhelming evidence

undercutting the defense-of-another theory, when both K.S.A. 60-261 and *Chapman* are taken into account, further persuades us that this case must be reversed and remanded for a new trial." 285 Kan. at 252. I strongly disagree. Even without the evidence admitted in violation of *Doyle*, the credibility of this defense was persuasively undermined in three ways: (1) by the direct and overwhelming evidence which showed the shooting was unprovoked and unjustified; (2) by the undisputed evidence that *before he was apprehended*, the defendant failed to tell anyone that he killed Martin in defense of another, despite numerous opportunities during which it would have been natural to do so; and (3) by the utter lack of credibility of the defendant's testimony.

The facts of this case are quite unique. Nine people who all knew each other gathered socially in the defendant's apartment. Included in this group were the defendant's roommates, Mamadou Drame and Bouba Sembene, the defendant's very close friend, Alrick Johnson, and Johnson's girlfriend, Brianna Moten. In addition, the defendant had invited his downstairs neighbor, Vanessa Engelbert, and her friends, Andrea Garrison and Chad Davis. Robert Martin, whom the defendant had known for a number of years, arrived at the party with Davis. Martin had not been invited, and it was established that the defendant was aware that Johnson was "leery" of Martin due to a prior incident involving Johnson's foster sister, who was Martin's girlfriend. Nevertheless, by all accounts, Martin was greeted warmly by everyone at the gathering, including the defendant.

Not long after arriving, Martin went to the back of the apartment. The defendant followed him back there. According to Davis, when he went to check on Martin and the defendant they were in the bedroom, relaxed and laughing.

When the men rejoined the party, Martin sat in a chair opposite the couch where Johnson, Moten, and Engelbert were sitting. Martin then got up, walked over to the couch, and tapped Johnson on the shoulder to get him to move over so he could sit on the couch. Martin then squeezed in between Johnson and Engelbert, putting four people on a couch meant for three. As Johnson described it, Martin was sitting so close he could feel Martin's body next to his.

There is no dispute that the defendant walked into the living room and, without comment and in front of seven acquaintances, shot Martin three times at fairly close range as he sat on the couch. These seven witnesses testified about the events before the shooting, the shooting, and the immediate aftermath. All of these witnesses undercut the defendant's version of the events leading up to the shooting. According to everyone but the defendant, Martin had not said or done anything that caused them concern for anyone's safety. All seven testified that there was no argument, unpleasantness, or provocation before the shooting. Even the defendant's good friend, Alrick Johnson, who, according to the defendant's trial testimony, was in mortal danger from Martin, testified that he had no reason to believe he was in danger from Martin that night. No one other than the defendant claimed to have seen Martin with a gun. It is difficult to see how the evidence could any more directly and overwhelmingly discredit the defendant's trial testimony as to why he shot Martin.

Moreover, I do not see how the evidence that the defendant failed to tell his exculpatory defense to the police could have had any effect on the jury's opinion of this defense, given the overwhelming evidence that the defendant failed to tell anyone that he had justifiably shot and killed Martin despite the many opportunities he had to do so before being apprehended. It is permissible to impeach witnesses " 'by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted.' " *Hernandez*, 284 Kan. at 82-83 (quoting *Jenkins v. Anderson*, 447 U.S. 231, 239, 65 L. Ed. 2d 86, 100 S. Ct. 2124 [1980]) (holding that impeachment by use of prearrest silence does not violate *Doyle*).

The defendant's first and best opportunity to tell someone that he was justified in shooting Martin arose just after the shooting, when Johnson asked the defendant what was going on. Although it would have been natural at that moment for the defendant to tell Johnson that Martin had a gun and he thought Martin was going to shoot Johnson, he said no such thing. Instead, he replied, "I don't know, man." The only other statement the defendant made

to Johnson was that he was worried that the girls would not "keep their mouths shut."

The defendant also had an opportunity immediately after the shooting to explain to Chad Davis, who was Martin's good friend, that he thought Martin had a gun and was going to shoot Johnson. However, as Chad Davis testified, the only thing the defendant said to him was, "That motherfucker tried to kill me."

The defendant's next opportunity to tell his version of the events occurred after he fled the apartment. According to the defendant, he tried unsuccessfully to flag down cars as he walked along the road. He even tried to flag down a police car. He then walked to a church and attended a service. A friend of his was there and the defendant spoke with him, but the defendant did not tell him what had happened.

The defendant's next opportunity to tell someone that he had killed in defense of another occurred after he arrived in Topeka. He went to a friend's house where he got a change of clothes and spent the night. Although he told his friend that police officers would be looking for him, he did not tell his friend anything about the incident.

The next opportunity came later when he met a man at a gas station in Topeka. The defendant testified that they walked around for a while, talking. The defendant admitted to the man that he had killed someone the previous night, but he did not tell him that he did it because he was defending someone.

The defendant's theory of defense of another was contradicted by direct and overwhelming evidence from seven eyewitnesses. Furthermore, the credibility of the defendant's theory was effectively impeached by properly admitted evidence showing that before he was apprehended, the defendant failed to offer his exculpatory version of events under circumstances in which it would have been natural to do so. That evidence was more than sufficient to support the reasonable inference that the defense-of-another theory was a recent fabrication. Thus, I believe beyond a reasonable doubt that the jury would have rejected the defendant's defense-of-another theory even without the *Doyle* violation.

This is not what could be called a close case. The jury had the defendant's version of events, contrasted with the evidence from the seven eyewitnesses which did not even marginally corroborate the defendant's version. The credibility of the defendant's testimony was impeached by the evidence that, before he was apprehended, he failed to tell anyone that he shot Martin in defense of Johnson. The desire to justify the killing to the eyewitnesses would have been strong. Two of the witnesses were his roommates. The defendant did not even tell Johnson he shot Martin to save his life. Any lingering question of credibility evaporated when the defendant's testimony degenerated into vague, rambling claims that he was on trial as the result of two separate conspiracies: (1) a conspiracy between Martin, Davis, and Garrison to "set him up" and (2) a conspiracy on the part of the Lawrence Police Department to cover up for Martin by moving evidence around in the apartment. To say the evidence of guilt in this case was overwhelming is an understatement; it was more like a massive tsunami.

Even if the issue is properly before us, I would hold that under the unique facts of this case the prosecutor's violation of *Doyle* was harmless beyond a reasonable doubt because it had little, if any, likelihood of changing the result. I would, therefore, affirm Cosby's conviction.