IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 109,634

CITY OF DODGE CITY,
*Appellee*,

v.

ORIE J. WEBB,
*Appellant.*


SYLLABUS BY THE COURT


1.

A threat to obtain a search warrant will invalidate a subsequent consent if there were not then grounds upon which a warrant could issue.


2.

When a statute affords citizens of Kansas greater protections against searches and seizures than the Fourth Amendment to the United States Constitution, the statute governs the permissible scope of state action. When such statutes are either silent or merely codify the federal constitutional standard, however, it is proper for courts to determine the permissibility of state action as a matter of constitutional law.


3.

K.S.A. 2011 Supp. 8-1001—the implied consent law in effect at the time of the arrest in this case—does not restrict law enforcement's ability to obtain a warrant for a blood draw after a breath test refusal.


1

Review of the judgment of the Court of Appeals in 50 Kan. App. 2d 393, 329 P.3d 515 (2014). Appeal from Ford District Court; DANIEL L. LOVE, judge. Opinion filed October 21, 2016. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Michael S. Holland II*, of Holland and Holland, of Russell, argued the cause and was on the brief for appellant.

*Terry J. Malone*, of Williams, Malone & Ralph, P.A., of Dodge City, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Orie J. Webb was convicted of driving under the influence after his motion to suppress evidence of his blood alcohol content obtained from a breath test was denied by the district court. Webb appealed his conviction arguing, in part, that the district court had erred by not suppressing the results of the breath test. Webb contended that he had been unconstitutionally coerced into submitting to the test because officers threatened to obtain a warrant for a blood test when, according to Webb, the officers could not lawfully have obtained such a warrant.

The Court of Appeals rejected Webb's argument and held that Kansas law would have permitted law enforcement to obtain a warrant, and thus the threat to do so was not coercive. See *City of Dodge City v. Webb*, 50 Kan. App. 2d 393, 394, 329 P.3d 515 (2014), *rev. granted in part* 302 Kan. 1008 (2015). We granted Webb's petition for review on this issue only in order to resolve a split between the holdings in this case and in *Hoeffner v. Kansas Dept. of Revenue*, 50 Kan. App. 2d 878, 335 P.3d 684 (2014), *rev. granted* 302 Kan. 1009 (2015). We conclude that the Court of Appeals holding below was correct, and we affirm.

2

FACTUAL AND PROCEDURAL BACKGROUND

The Court of Appeals panel adequately summarized the relevant facts:

"On November 24, 2011, at 1:56 a.m., Officer Justin Warkentin of the Dodge City Police Department stopped a vehicle for an insufficiently illuminated license plate; Warkentin could not read the expiration date on the plate. At the time of the stop, Warkentin did not suspect the driver was impaired.

"As he approached, Warkentin detected a strong odor of alcohol coming from inside the vehicle. Warkentin identified Webb as the driver and noted there were two passengers in the vehicle. The passengers admitted to drinking, but Webb denied having had anything to drink.

"After he checked Webb's driver's license, Warkentin asked Webb to step out of the vehicle so he could determine whether the odor of alcohol was coming from Webb or his passengers. After Webb exited the vehicle, Warkentin determined there was a moderate odor of alcohol coming from Webb's person and asked Webb a second time whether he had consumed any alcoholic beverages. Webb admitted to drinking one beer.

"Webb agreed to perform two field sobriety tests and failed both; he displayed four out of eight clues of impairment on the walk-and-turn test and three out of four clues of impairment on the one-leg-stand test. At the conclusion of the field sobriety tests, Webb agreed to take a PBT, the results of which indicated his blood-alcohol level was .127." *Webb*, 50 Kan. App. 2d at 394-95.

The panel found that probable cause supported Officer Warkentin's belief that Webb was driving under the influence and justified his request that Webb submit to the preliminary breath test. 50 Kan. App. 2d at 398. Those findings are not under review here.

Following Webb's preliminary breath test, Warkentin arrested Webb and transported him to the Ford County Jail for further testing with an Intoxilyzer. At the jail, Warkentin gave Webb a copy of the DC-70 implied consent form and read the form to

3

him. Warkentin then asked Webb if he wanted to submit to a breath test. Warkentin testified:

> "He said he didn't really want to. I don't remember his exact words. And, I basically told him that if that was gonna be his decision, that my policy, or, what we were told at the Police Department, is that we have to apply for a search warrant if the subject refuses the Intoxilyzer 8000."

Warkentin told Webb he would obtain a search warrant for a blood draw. Webb replied that he was scared of needles and did not want his blood taken. Given these alternatives, Webb consented to take the Intoxilyzer test, the results of which showed his blood alcohol content to be over the legal limit.

The district court denied Webb's motion to suppress the results of the breath test, reasoning that because the officers would have been legally able to obtain a warrant for a blood draw, Warkentin's statements to Webb were truthful and therefore not impermissibly coercive so as to render Webb's consent involuntary. The Court of Appeals agreed, as do we.

## ANALYSIS

The standard of review governing an appeal of a trial court's decision on a motion to suppress is well established:

> "An appellate court generally reviews a trial court's decision on a motion to suppress using a bifurcated standard. The trial court's findings are first reviewed to determine whether they are supported by substantial competent evidence. Appellate courts do not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. The ultimate legal conclusion regarding the suppression of evidence is then reviewed de novo. If the material facts in a trial court's decision on a motion to

4

suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. [Citation omitted.]" *State v. Martinez*, 296 Kan. 482, 485, 293 P.3d 718 (2013).

Here, the material facts are not in dispute. The only remaining questions are questions of law over which we exercise plenary review.

"For a consent to search to be valid, two conditions must be met:  (1) There must be clear and positive testimony that consent was unequivocal, specific, and freely given and (2) the consent must have been given without duress or coercion, express or implied." *State v. Thompson*, 284 Kan. 763, 776, 166 P.3d 1015 (2007).

> "Generally, a threat to obtain rather than a threat to seek a search warrant will invalidate a subsequent consent if there were not then grounds upon which a warrant could issue. If a law enforcement officer states that a search warrant can be obtained and, in fact, there are grounds for the issuance of a warrant, the statement is correct and does not constitute coercion. However, law enforcement officers act at their peril in threatening to obtain a search warrant unless probable cause actually exists." *State v. Brown*, 245 Kan. 604, 612-13, 783 P.2d 1278 (1989).

The district court held that there existed sufficient probable cause to support a warrant for a blood draw in this case. The Court of Appeals agreed, and that holding is not before us on review. The narrow issue this appeal presents is whether Kansas law—at the time of Webb's arrest—permitted any testing of a person's blood alcohol content after that person refused a test pursuant to the terms of the implied consent rubric. Webb argues that following his refusal, the State was statutorily prohibited from obtaining any subsequent testing and that, therefore, while such testing may not have been prohibited by the Fourth Amendment to the United States Constitution, it nonetheless was legally unavailable to law enforcement in his case. Thus, Webb reasons, law enforcement

5

officers were incorrect when they claimed they could obtain a warrant for a blood draw, and his ensuing consent was then rendered involuntary.

Webb's reasoning is valid, but it is not sound. In other words, Webb is correct that regardless of what is permissible pursuant to the Fourth Amendment, Kansas may enact statutes that place greater restrictions on law enforcement. See *State v. James*, 301 Kan. 898, 908, 349 P.3d 457 (2015). Webb is further correct that if such a statutory scheme exists, it would render a threat to obtain a warrant in reliance on Fourth Amendment principles factually infirm on other grounds and thus fatally undermine any subsequent consent. But while it is clear that such a statutory scheme once existed in Kansas, by the time of Webb's arrest, it no longer did.

Webb relies on the holding of *State v. Adee*, 241 Kan. 825, 833, 740 P.2d 611 (1987), that a search warrant cannot be obtained to compel a blood test after a defendant has refused testing pursuant to the Kansas implied consent laws. In reaching this conclusion, the *Adee* court relied on K.S.A. 1986 Supp. 8-1001(f)(1)(E) which stated in part: "'If the person refuses to submit to . . . a test as requested . . . additional testing shall not be given.'" 241 Kan. at 831. "This provision is not construed to be a right of refusal but, rather, it was included in the statute 'as a means to avoid the violence which would often attend forcible tests upon a rebellious drunk.'" 241 Kan. at 831 (quoting *State v. Garner*, 227 Kan. 566, 571-72, 608 P.2d 1321 [1980]).

As the Court of Appeals panel below recognized, the implied consent laws went through numerous iterations in the 20 years following *Adee*, which slightly modified this outright prohibition on subsequent tests. Following revisions in 2003, 2006, and 2007, both this court and different panels of the Court of Appeals held that subsequent testing after a refusal could only be obtained when a person had been involved in an accident involving death or serious bodily injury. See, *e.g.*, *State v. May*, 293 Kan. 858, 865, 269

6

P.3d 1260 (2012); *State v. Fritzemeier*, No. 97,016, 2007 WL 2080481 (Kan. App. 2007) (unpublished opinion); *State v. Befort*, No. 91,565, 2005 WL 81499, at *3 (Kan. App. 2005) (unpublished opinion). But for this exception, the portions of the implied consent statute reviewed in *May*, *Fritzemeier*, and *Befort* were substantially identical to the language at issue in *Adee*, as follows:

> "If the person refuses to submit to . . . a test as requested pursuant to this section, *additional testing shall not be given* unless the certifying officer has probable cause to believe that the person, while under the influence of alcohol . . . has operated a vehicle in such a manner as to have caused the death of or serious injury to another person." (Emphasis added.) K.S.A. 8-1001(h).

The difficulty facing Webb—one he cannot overcome—is that in 2008 the Kansas Legislature deleted subsection (h) from the Kansas implied consent laws. And the prohibition against subsequent testing after a refusal was not recodified in any other section of the law.

Webb does point us to a different subsection of the 2008 amendments to the Kansas implied consent scheme: "A law enforcement officer may direct a medical professional described in this section to draw a sample of blood from a person: . . . if the person refuses to submit to and complete a test, if the person meets the requirements of paragraph (2) of subsection (b)." K.S.A. 2011 Supp. 8-1001(d)(3). Subsection (b)(2) describes the circumstance when "the person was operating or attempting to operate a vehicle and such vehicle has been involved in an accident or collision resulting in serious injury or death of any person and the operator could be cited for any traffic offense." K.S.A. 2011 Supp. 8-1001(b)(2).

Webb contends that despite the absence of the explicit "additional testing shall not be given" following a refusal language from subsection (h), subsection (d)(3) makes it

7

clear that law enforcement may only seek a blood draw in the narrow circumstances of an injury or fatality accident. Webb's argument is not without some appeal, as aptly demonstrated by a separate Court of Appeals panel which—when considering precisely this claim—agreed that subsection (d)(3) controls and limits the ability of a law enforcement officer to obtain a warrant for a blood draw following the suspect's refusal under the implied consent scheme. *Hoeffner*, 50 Kan. App. 2d at 886-87.

Thus, the question before us is clearly and properly framed as one of statutory interpretation. We exercise unlimited review over questions of statutory interpretation, and the principles we follow are well settled:

> "The most fundamental rule is that the intent of the legislature governs if that intent can be ascertained. [*State v.*] *Arnett*, 290 Kan. [41,] 47[, 223 P.3d 780 (2010)]. An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Raschke*, 289 Kan. 911, 914, 219 P.3d 481 (2009). When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history or other background considerations to construe the legislature's intent. *State v. Trautloff*, 289 Kan. 793, 796, 217 P.3d 15 (2009)." *State v. Urban*, 291 Kan. 214, 216, 239 P.3d 837 (2010).

Furthermore, "[w]hen the legislature revises an existing law, as here, it is presumed that the legislature intended to make some change in the law as it existed prior to the amendment." *Adee*, 241 Kan. at 829 (citing *Curless v. Board of County Commissioners*, 197 Kan. 280, 587, 419 P.2d 876 [1966]).

We also deem it important to recognize that this particular question of statutory interpretation is posed against a backdrop of constitutional law. That is, it is the Fourth

Amendment to the United States Constitution that sets forth: (1) the minimal requirements which must be met prior to the issuance of a warrant; and (2) the minimal protections of the individual right not to be subject to unreasonable searches and seizures. See also Kan. Const. Bill of Rights, § 15. When law enforcement officers properly authorized to execute the state's police power act within minimal constitutional parameters (both federal and state), such acts have a presumption of lawfulness unless expressly prohibited by a state's enactment of greater protections for its citizens.

We recently clarified our interpretive process when evaluating such interplay between a constitutional baseline and what is alleged to be a statutory overlay that further restricts the permissible acts of law enforcement.

"When a statute . . . affords citizens of Kansas greater protections against searches and seizures than the Fourth Amendment to the United States Constitution, the statute governs the permissible scope of state action. When such statutes are either silent or merely codify the federal constitutional standard, however, it is proper for courts to determine the permissibility of state action as a matter of constitutional law." *James*, 301 Kan. 898, Syl. ¶ 1.

We conclude that here—on the specific question of whether a law enforcement officer may obtain a warrant for a blood draw after a breath test refusal—the implied consent law in effect at the time of Webb's arrest was simply silent. Without the "additional testing shall not be given" language, there is nothing in the statutory scheme that prohibits law enforcement from obtaining and executing a warrant in accordance with the constitutionally prescribed minimal requirements and individual protections. This conclusion is bolstered by the fact that such language once existed in the statute but was removed. By such removal, we may presume the legislature intended a change in the law as it existed prior to the amendment.

9

Moreover, we decline to accept Webb's invitation to read more into subsection (d)(3) than is really there. That subsection, too, is *silent* with respect to the narrow issue before us—obtaining a warrant. We need not reach an interpretive conclusion as to the precise meaning and application of subsection (d)(3). It is sufficient to reach the conclusion that this subsection—along with the rest of the implied consent law after the 2008 revisions—is silent on the question before us.

Therefore, because Webb does not contend—and the facts do not indicate—that Warkentin's threat to obtain a warrant was constitutionally unjustified, and it was not statutorily prohibited, Webb's subsequent consent was not involuntary, and the lower courts properly declined to suppress the breath test results.

Affirmed.

* * *

JOHNSON, J., dissenting:  I dissent, principally because I disagree with the majority's construction of the Implied Consent Act, which I will discuss below.

But first, I express my concern that the majority opinion gives the wrong impression about how Kansas exercises its police powers by suggesting that a Kansas law enforcement officer's authority to obtain a search warrant exists simply by virtue of the absence of either a Fourth Amendment violation or a statutory prohibition. I submit that the authority of a Kansas law enforcement officer to obtain a warrant must come from an affirmative enactment of the Kansas Legislature. *Cf. Manning v. Davis*, 166 Kan. 278, 280-81, 201 P.2d 113 (1948) (all governmental power, including the exercise of police power, vested in the people, who "[n]ormally . . . exercise their governmental powers through the legislature"). The role of the Fourth Amendment is simply to protect Kansans

10

when the legislatively granted authority goes too far and infringes on individual rights; it grants no power or privilege to the government or to any governmental agent. As Thomas Jefferson wrote in a letter to James Madison on December 20, 1787: "[A] bill of rights is what the people are entitled to against every government on earth, general or particular, and what no just government should refuse." *United States v. Emerson*, 270 F.3d 203, 266 (5th Cir. 2001) (citing "The Origin of the Second Amendment" [2d ed. 1995] [Golden Oaks Books]).

Perhaps more importantly, this case simply does not present any disputed Fourth Amendment questions. As the majority acknowledges, the district court's holding that there existed sufficient probable cause to support a warrant for a blood draw under these facts is not a disputed issue in this appeal. The question is whether there was *statutory* authority for the warrant. Consequently, our cases analyzing probable cause in the context of the Fourth Amendment have no relevance here. Likewise, the State does not challenge or dispute Webb's contention that his Fourth Amendment right to be free from an unreasonable search or seizure was violated if Officer Warkentin coerced his consent to a warrantless search by threatening to obtain a search warrant when the officer had no legal authority to seek such a warrant. Again, given that the existence of probable cause is not in issue, the question of whether the officer possessed the legal authority to seek a search warrant for Webb's blood is not governed in this case by the Fourth Amendment but rather by statutory interpretation, *i.e.*, whether the legislature has exercised the police power to invest the officer with search warrant authority under the circumstances. In short, the parameters of police conduct permitted by the Fourth Amendment are not germane to resolving this case.

Apparently, the Kansas Legislature has discerned that its exercise of the police power—not the absence of a Fourth Amendment violation—is the source of a governmental agent's lawful authority to obtain a search warrant in this State. It has

11

occupied that field by enacting detailed provisions governing the issuance and execution of search warrants. See K.S.A. 22-2502 *et seq.* Pointedly, the legislature has laid out a detailed list of things that can be searched or seized pursuant to a magistrate's search warrant. K.S.A. 2015 Supp. 22-2502(a)(1)(A)-(G). Further, it has established territorial and time limits on certain search warrants, K.S.A. 2015 Supp. 22-2503, as well as specifying the persons authorized to execute search warrants, K.S.A. 22-2505.

Then, having exercised its prerogative to generally define the Kansas government's search warrant authority in K.S.A. 22-2502 *et seq.*, the legislature has consistently indicated in the implied consent law that K.S.A. 22-2502 governs search warrant authority in the context of driving under the influence (DUI) prosecutions, as well. Since 1988, the various iterations of K.S.A. 8-1001 have all contained the following identical language, albeit in different subsections of the statute, to-wit: "In such event, such test or tests may be made pursuant to a search warrant issued under the authority of K.S.A. 22-2502, and amendments thereto, or without a search warrant under the authority of K.S.A. 22-2501, and amendments thereto." See, *e.g.*, L. 1988, ch. 47, sec. 13 (subsection [f][1] of 8-1001); L. 2001, ch. 200, sec. 12 (subsection [k] of 8-1001); L. 2008, ch. 170, sec. 1 (subsection [p] of 8-1001); L. 2011, ch. 105, sec. 9 (subsection [p] of 8-1001); and L. 2014, ch. 131, sec. 1 (subsection [p] of 8-1001). The event referred to is operating a vehicle in such a manner as to have caused the death of or serious injury to a person. The warrantless search statute referred to is the search incident to arrest provision that has been repealed. But the first point to be made from the statutory review is that the legislature has stated quite explicitly that the authority in Kansas to obtain a search warrant for blood, breath, or urine tests under the implied consent law derives from K.S.A. 22-2502, not from the absence of a Fourth Amendment violation.

The second point to be made is that the majority has focused entirely on the deletion of the phrase, "additional testing shall not be given," in K.S.A. 2008 Supp. 8-

12

1001(m), while ignoring the repositioned provision in K.S.A. 2011 Supp. 8-1001(p) that authorizes an officer to use the authority of K.S.A. 22-2502 to obtain a blood test if a person has operated a vehicle "in such a manner as to have caused the death of or serious injury to a person." That tack ignores the construction rule that "'courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof *in pari materia.*' *Kansas Commission on Civil Rights v. Howard*, 218 Kan. 248, Syl. ¶ 2, 544 P.2d 791 (1975)." *In re Adoption of G.L.V.*, 286 Kan. 1034, 1041, 190 P.3d 245 (2008). Specifically, the aforementioned references in K.S.A. 8-1001 to the general search warrant statute, K.S.A. 22-2502, belie the majority's conclusion that "on the specific question of whether a law enforcement officer may obtain a warrant for a blood draw after a breath test refusal—the implied consent law in effect at the time of Webb's arrest was simply silent." Slip op. at 10. The statute was not *silent* about a law enforcement officer's authority to use a search warrant to force a blood test; it was just not explicit about whether the general search warrant provision could be used if the suspect's driving had not killed or injured a person.

The legislative choice to describe one scenario by which a law enforcement officer could use the general search warrant provision to effect a blood test, while omitting any other instances where a search warrant could be used might trigger the legal maxim, *expressio unius est exclusio alterius* (the inclusion of one thing implies the exclusion of another). In other words, the legislature's inclusion of a provision for the use of a search warrant where the DUI caused death or serious injury means it intended to exclude the use of a search warrant in other circumstances. After all, if the legislature really intended to change decades of caselaw holding that a search warrant could not be used to force a blood test after a refusal to consent to testing, the logical, clear, and unequivocal—*i.e.*, plain and unambiguous—manner in which to state that intent would have been to simply recite: "If an officer shall have probable cause to believe that the person operated a vehicle while under the influence of alcohol or drugs, or both, appropriate testing may be

13

made pursuant to a search warrant issued under the authority of K.S.A. 22-2502, and amendments thereto." Pointedly, the legislature chose not to say that.

If nothing else, the legislative silence alleged by the majority would create an ambiguity. *Cf. State v. Quested*, 302 Kan. 262, 268, 352 P.3d 553 (2015) (legislative silence on whether sentence can be imposed consecutive to out-of-county sentence creates an ambiguity which permits rules of construction and use of common law). Where a statute's language or text is unclear or ambiguous, a court may use canons of construction or legislative history to construe the legislature's intent. *State v. Phillips*, 299 Kan. 479, 495, 325 P.3d 1095 (2014).

Here, the legislative history on the 2008 amendments—upon which the majority exclusively relies—suggests that the elimination of the "additional testing shall not be given" language was inadvertent and did not manifest a legislative intent to expand the circumstances under which a law enforcement officer could obtain a search warrant to force a blood draw on a nonconsenting driver. Testimony in support of the bill by Ed Klumpp on behalf of the Kansas Association of Chiefs of Police pointed out that the authority for "forced draws" already existed in the current law and that the bill did not change the legal standard for those draws. Specifically, he explained that "[t]he current law, and the language of the bill, allows for forced draws only when there is an accident involving serious injury or death and the law enforcement officers meets [*sic*] the requirement of K.S.A. 22-2502 for a search warrant or K.S.A. 22-2501 for a search under exigent circumstances." Minutes of the Senate Judiciary Committee, March 5, 2008, Attachment 4. In other words, the legislative history actually contradicts the majority's declaration that the legislature intended its 2008 amendments to remove any prohibition against subsequent testing after a refusal.

In spite of that legislative history, the majority employs a liberal construction of the statute to favor the State. But K.S.A. 8-1001 is a penal statute that should be strictly construed in favor of the accused. See *Phillips*, 299 Kan. at 495. Further,

"'where a criminal statute is silent or ambiguous on a matter, the rule of lenity applies to mandate that the statute be construed in favor of the accused. *Cf. State v. Thompson*, 287 Kan. 238, 249, 200 P.3d 22 (2009) (statute silence or ambiguity on unit of prosecution construed in favor of defendant).' *State v. Reese*, 300 Kan. 650, 653, 333 P.3d 149 (2014)." *State v. Cheeks*, 302 Kan. 259, 260, 352 P.3d 551 (2015).

The only qualification on the rule of lenity is that the judicial interpretation in favor of the accused must be reasonable and sensible to effect the legislative design and intent of the act. *State v. LaGrange*, 294 Kan. 623, 630, 279 P.3d 105 (2012) (citing *State v. Jackson*, 291 Kan. 34, 40, 238 P.3d 246 [2010]). The majority appears to acknowledge that Webb's arguments and the holdings by the Court of Appeals panel in *Hoeffner v. Kansas Dept. of Revenue*, 50 Kan. App. 2d 878, 886-87, 335 P.3d 684 (2014), *rev. granted* 302 Kan. 1009 (2015), are not nonsensical or unreasonable. I agree.

Construing K.S.A. 2011 Supp. 8-1001 as continuing to prohibit the general use of a search warrant to effect a forced blood draw furthers the oft-stated design and intent of the legislation, which is to coerce a person to consent to testing in order to avoid the potential violence of a forcible blood draw. On the other hand, the majority's holding undermines that design and intent because a law enforcement officer can essentially proceed almost directly to a warrant-based forcible draw. Further, if a law enforcement officer can always get a search warrant to draw blood from a nonconsenting driver where the officer has probable cause of a DUI, the intricate provisions of the implied consent law that are designed to coerce a consent, *e.g.*, the required warnings, seem to lose their relevance and efficacy. Certainly, the justification for the draconian penalties that are visited upon a person who refuses to consent to an officer invading his or her body to

perform an alcohol test, *i.e.*, the penalties are necessary to obtain objective test results, evaporates if the only effect of the consent would be to relieve the officer of the inconvenience of obtaining a constitutionally required search warrant to get the objective test results without consent.

But even if the majority's statutory analysis of the implied consent act could withstand further scrutiny, it would still run afoul of its own cherry-picked rules of construction when the analysis turns back to the general search warrant provisions of K.S.A. 22-2502. In 2015, the legislature amended that statute to modify the list of things for which a magistrate could issue a warrant to search or seize, adding the following two subsections under K.S.A. 2015 Supp. 22-2502(a)(1): "(A) Any thing that can be seized under the fourth amendment of the United States constitution;" and "(E) any biological material, DNA, cellular material, blood, hair or fingerprints." As the majority has opined, "we may presume the legislature intended a change in the law as it existed prior to the amendment." Slip op. at 10. Accordingly, prior to July 1, 2015, one has to presume that the Fourth Amendment was not the measure of authority for search warrants and that a search warrant for blood was not statutorily authorized. Given that Webb's acts occurred in 2011, he would not be subject to a blood draw warrant.

On the other hand, if the 2008 amendments to K.S.A. 8-1001 allowed law enforcement officers to obtain search warrants for blood, as the majority contends, then the 2015 amendments to K.S.A. 22-2502, specifically authorizing a search warrant for blood, would appear to violate the canon that we presume the legislature does not enact meaningless legislation. See *State v. Frierson*, 298 Kan. 1005, 1013, 319 P.3d 515 (2014). In short, the majority's construction of the 2008 amendments to K.S.A. 8-1001 runs afoul of our rules of statutory construction and is contrary to the legislative history describing the purpose of those amendments.

16

In conclusion, this court has made it clear to the legislature, since *State v. Adee*, 241 Kan. 825, 833, 740 P.2d 611 (1987), that a search warrant cannot be obtained to compel a blood test after a defendant has refused testing pursuant to the Kansas implied consent laws, except in the case where the DUI caused serious injury or death. If the legislature intends to change that law, it must explicitly state its intent in plain and unambiguous language. Otherwise, the law remains the same. I would reverse the Court of Appeals.

LUCKERT, J., joins in the foregoing dissenting opinion.